C76efaic

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    FAIRFIELD SENTRY LIMITED (IN
3   LIQUIDATION), et al.,

4                 Plaintiffs,

5            v.                            12 MC 218(LAP)

6   HSBC PRIVATE BANK (SUISSE) SA,
    et al.,
7
                  Defendants.
8   ------------------------------x
                                          July 6, 2012
9                                         9:14 a.m.

10  Before:

11                    HON. LORETTA A. PRESKA,

12                                        District Judge

13                         APPEARANCES

14  BROWN RUDNICK LLP
         Attorneys for Plaintiffs
15  BY:  DAVID MOLTON
         MAY ORENSTEIN
16       KERRY QUINN

17  CLEARY GOTTLIEB STEEN & HAMILTON, LLP
         Attorneys for Defendant HSBC Private Bank (Suisse) SA,
18       et al.
    BY:  THOMAS J. MOLONEY
19       CHARLES J. KEELEY

20  O'MELVENY & MYERS, LLP
         Attorneys for Defendant Credit Suisse International
21  BY:  WILLIAM J. SUSHON
         DANIEL SHAMAH
22
    K&L GATES
23       Attorneys for Defendant Andorra Banc Angricol Reig, S.A.
    BY:  W.M. SHAW McDERMOTT
24
    SULLIVAN & CROMWELL, LLP
25       Attorneys for Defendant Standard Chartered Bank
    BY:  ROBINSON B. LACY

C76efaic

1             (Case called)

2             (In open court)

3             THE COURT:  Mr. Molton?

4             MR. MOLTON:  Yes, your Honor.

5             THE COURT:  Good morning.

6             MR. MOLTON:  Good morning, your Honor.  We're glad to

7    see you again today.

8             THE COURT:  Nice to see you.

9             Mr. Moloney.

10            MR. MOLONEY:  Good morning, your Honor.

11            THE COURT:  Good morning.

12            Mr. Sushon?

13            MR. SUSHON:  Good morning, your Honor.

14            THE COURT:  And Mr. McDermott?

15            MR. McDERMOTT:  Good morning, your Honor.

16            THE COURT:  Good morning.

17            Mr. Lacy, good morning.

18            MR. LACY:  Good morning, your Honor.

19            THE COURT:  And good morning to everyone else.

20            Just by way of background, on Wednesday, June 27,

21   2012, the Honorable Burton R. Lifland entered a memorandum

22   decision and order in the underlying case in the United States

23   bankruptcy court granting the foreign representatives' motion

24   seeking expedited initial disclosures.  ("The foreign

25   disclosure order").  Various defendants now seek leave of this

C76efaic

1   Court to appeal the foreign disclosure order on an emergency

2   basis pursuant to 28 U.S.C. Section 158(a) and the Federal

3   Rules of Bankruptcy Procedure 8003, 8005 and 8011(d).

4           On June 29, 2012, this Court granted defendants'

5   request for a stay of the foreign disclosure order pending

6   these proceedings.  Accordingly, now pending before the Court

7   are the following motions, each of which requests substantially

8   identical relief:

9           The motion by the Cleary Gottlieb firm as attorneys

10  for defendants HSBC Private Bank (Suisse) SA, and others,

11  seeking leave to appeal foreign disclosure order and reversal

12  of that order.

13          The motion by the O'Melveny firm as attorneys for

14  defendants Credit Suisse International and Credit Suisse

15  Luxembourg SA seeking leave to appeal the foreign disclosure

16  order, reversal of that order or, in the alternative, the

17  issuance of a writ of mandamus vacating that order.

18          The motion by the Sullivan Cromwell firm as attorneys

19  for defendant Standard Chartered Bank seeking leave to appeal

20  the foreign disclosure order, reversal of that order and

21  dismissal of the underlying adversary proceeding in the

22  bankruptcy court for lack of subject matter jurisdiction.

23          And a motion by K&L Gates as attorneys for defendant

24  Andorra Banc Agricol Reig, SA, seeking leave to appeal the

25  foreign disclosure order, reversal of that order, the issuance

C76efaic

1   of a writ of mandamus vacating that order, or in the

2   alternative, clarification that the foreign disclosure order

3   only applies to those parties and transactions about which the

4   foreign representative has submitted actual subscription

5   agreements.

6           The moving parties variously join in one another's

7   motions and the arguments contained therein.  Further, moving

8   parties' motions are variously joined by defendants Falcon

9   Private Bank Limited, Incore Bank AG and Maria Ferere as

10   liquidator of Banco Atlantico (Bahamas) Bank & Trust Limited,

11   as well as those defendants represented by the following

12   counsel:  Andrews Kurth; McKool Smith; Flemming Zulack

13   Williamson &Zauderer; Harnick Wilker & Finkelstein; Hogan

14   Lovells; Debevoise & Plimpton; SNR Denton; Sidley Austin;

15   Becker Glynn Melamed & Muffly; Reiss & Preuss; Chaffetz

16   Lindsey; Kramer Levin Naftalis & Frankel; Shearman & Sterling;

17   Ropes & Gray; Cooley; King & Spalding; Davis & Gilbert; Bond

18   Schoenek & King; Kleinberg Kaplan Wolff & Cohen; Beys Stein &

19   Mobargha; Latham & Watkins; Gibson Dunn; Wrobel & Schatz;

20   Morgan Lewis & Bockius; Baker & McKenzie; Kobre & Kim; Law

21   Office of John J. Lynch; Dechert; Wilmer Cutler Pickering

22   Hale & Dorr; Reed Smith; Wachtel Lipton; Weursch & Gering;

23   Chadbourne & Park; Fried Frank; Wiggin & Dana; Willkie Farr &

24   Gallagher; DLA Piper; Cravath; Katten Munchin Rosenman;

25   Cadwalader; Arnold & Porter; Patton Boggs; Milbank Tweed;

C76efaic

1    Scheichet & Davis; Butzel Long; Moses & Singer; Withers

2    Bergman, whose joinder is deemed timely nunc pro tunc;

3    Linklaters, whose joinder is deemed timely nunc pro tunc;

4    Tannenbaum Helpern Syracuse and Hirschtritt, whose joinder is

5    deemed timely nunc pro tunc.

6            As stated in the Court's June 29 order, any defendants

7    wishing to join in these motions were to have so indicated by

8    5:00 last Friday.  At this time is there any other defendant

9    who has not yet filed either a notice of appearance or formal

10   joinder in the motions and wishes to join?

11           All right, then.  Before we proceed, the parties are

12   informed that one of my law clerks, Ryan Yanovich, is a former

13   associate with O'Melveny & Myers here in New York and plans to

14   return to that firm this September.  Mr. Yanovich reminded me

15   of this fact immediately upon the filing of O'Melveny's notice

16   of appearance in this case.  While an associate Mr. Yanovich

17   performed no work on matters for the entities the firm

18   represents in this case or in any matter related to this case,

19   and he has no client confidential information regarding this

20   case.

21           Any objections to his continuing to work?

22           MR. MOLTON:  None, your Honor.

23           THE COURT:  Thank you, counsel.

24           By way of background, plaintiffs Fairfield Sentry

25   Limited, Fairfield Sigma Limited and Fairfield Lamda Limited,

C76efaic

1   (hereinafter the "funds") are three funds organized under the

2   laws of the British Virgin Islands (hereinafter "BVI").  The

3   funds sold shares to foreign investors and "invested" the

4   proceeds with Bernard L. Madoff Investment Securities, LLC

5   (hereinafter "BLMIS").  The funds' shareholders could redeem

6   their shares at will.

7          After Madoff's fraud was exposed, the funds'

8   "investments" were eviscerated.  As a result, each of the funds

9   entered in liquidation proceedings in either February or April

10  of 2009 in the BVI.

11         The BVI courts appointed liquidators and foreign

12  representatives of the plaintiffs.  Beginning in April 2010,

13  the foreign representatives began filing numerous lawsuits for

14  plaintiffs in the New York State courts against these and other

15  defendants.  These defendants are generally banks and the

16  unknown beneficial holders of the interests in the funds.  Many

17  banks purchased shares in the funds, and were the registered

18  owners, then resold them to individual clients who were the

19  beneficial owners of the shares.  Plaintiffs originally made

20  only state law claims for money had and received, unjust

21  enrichment, mistaken payment and constructive trust.  The

22  theory of all these claims, however titled, is the same:

23  Because of Madoff's fraud, the funds miscalculated the net

24  asset value (hereinafter "NAV") of the shares, which resulted

25  in inflated share prices upon redemption.  Plaintiffs challenge

C76efaic

1   the transfers made to redeem shares because the amounts paid on

2   redemption were allegedly too high.

3           On June 14, 2010, the foreign representatives

4   commenced an ancillary proceeding in the bankruptcy court in

5   the Southern District of New York under Chapter 15 of Title 11,

6   United States Code, seeking recognition of the BVI liquidation

7   proceedings as "foreign main proceedings."  11 U.S.C. Sections

8   1502(4) and 1515.  That petition was granted on July 22, 2010.

9   *Fairfield I*, 440 B.R. at 66.

10          After this, the foreign representatives began filing

11  substantially identical claims in the bankruptcy court rather

12  than in state court.  To date, over 200 substantially similar

13  lawsuits have been filed in the state and federal courts.

14  After recognition, the foreign representatives under 28 U.S.C.

15  Section 1452(a) removed the actions that had been filed in

16  state court to this court which referred them automatically to

17  the bankruptcy court.  Not all of the actions were removed

18  simultaneously.  Now all of these lawsuits have been

19  consolidated in the bankruptcy court.

20          Before recognition, the foreign representatives

21  commenced in the New York State courts the 41 lawsuits against

22  the present defendants claiming over $3 billion.  These

23  defendants filed the motions to remand or abstain in the

24  bankruptcy court on October 4, 2010, arguing that the

25  bankruptcy court lacked subject matter jurisdiction and that it

C76efaic

should abstain from hearing these cases.  In addition, certain
defendants claimed that the removal of the actions against them
was untimely.

          After the remand motions were filed, the foreign
representatives amended 34 of the instant actions in
January 2011 to include statutory claims under BVI law for
"unfair preferences" and "undervalue transactions."  These
claims target transfers made within the vulnerability period
under BVI law.  Nevertheless, the essential facts to be
determined are identical to the state law claims for mistaken
payment.

          On May 23, 2011, the bankruptcy court denied the
remand motion.  *Fairfield III*, 452 B.R. at 69.  The bankruptcy
court ruled that it had "core" bankruptcy jurisdiction under 28
U.S.C. Section 1334(a) "over the BVI avoidance claims in
particular, and the actions as a whole" because they "directly
affect this Court's core bankruptcy functions under chapter
15." *Id.* at 74, see *Id.* at 74-82.

          In the alternative, the Court ruled that it had
"related to" jurisdiction because the actions are related to
the plaintiffs' chapter 15 case. *Id.* at 82.  The Court also
ruled that it would not abstain under either the mandatory or
permissive standards. *Id.* at 83-86.  It also sua sponte
enlarged the time period for removal of the allegedly untimely
removed actions and granted the foreign representative's

C76efaic

1  application pursuant to Section 108 of the bankruptcy code for

2  a two-year toll of applicable statutes of limitations to bring

3  suit against new defendants. *Id.* at 87-91.  That toll took

4  effect as of the date of Chapter 15 recognition, July 22, 2010,

5  and, therefore, expires on July 22, 2012. *Id.* at 62-63.

6          This Court granted defendants' motion for a stay

7  pending leave to appeal that order on July 14, 2011, and

8  extended that stay of oral argument until a decision on the

9  motion for leave to appeal was rendered.

10          On September 19, 2011, this Court granted

11  interlocutory appeal from and reversed the decision of the

12  bankruptcy court, denying defendants' motions for remand and/or

13  abstention.  See *In Re Fairfield Sentry Limited Litigation*,

14  458 B.R. 665 (S.D.N.Y. 2011).  This Court overturned the

15  bankruptcy court's determination that these actions are within

16  its "core" bankruptcy jurisdiction, but did not reach the issue

17  of "related to" jurisdiction.  Instead, this Court remanded the

18  case to the bankruptcy court for reconsideration of the

19  mandatory abstention question.  Having found all other factors

20  in the mandatory abstention analysis to favor defendants, this

21  Court directed the bankruptcy court to address the narrow issue

22  of whether these claims can be timely adjudicated in the courts

23  of New York.

24          In the meantime, on October 10, 2011, the BVI court

25  awarded final judgment to defendants in the proceeding taking

C76efaic

1    place there.  See Bankruptcy ECF Nos. 645-1, 741 (describing

2    the October 2011 judgment of the BVI court).

3             On October 18, 2011, the bankruptcy court stayed all

4    proceedings before it pending, one, the foreign

5    representative's request for interlocutory appeal of this

6    Court's September 19, 2011, ruling to the Court of Appeals for

7    the Second Circuit; and two, his anticipated appeal of the BVI

8    final judgment to the Eastern Caribbean Court of Appeals.  That

9    stay remains in effect with the exception of the foreign

10   disclosure order now before this Court.

11            On March 1, 2012, the Court of Appeals for the Second

12   Circuit denied the foreign representative's requested

13   interlocutory appeal, and on June 13, 2012, the Eastern

14   Caribbean Court of Appeals affirmed the judgment of the BVI

15   Court.  While the foreign representative appears to have

16   informed the bankruptcy court that he is considering requesting

17   leave for further appeal of the Eastern Caribbean Court of

18   Appeals decision to the Privy Council of the United Kingdom, no

19   such appeal is currently pending, as far as this Court is

20   aware.  See Bankruptcy ECF No. 741.

21            On or about May 25, 2012, the foreign representative

22   requested that the bankruptcy court lift its stay and enter an

23   order requiring disclosure from the named registered

24   shareholder defendants of the identities and contact

25   information of the unnamed beneficial owners of the shares, as

C76efaic

well as permission to amend the complaints to name those owners

as defendants.  Defendants objected to such an order on the

grounds that the bankruptcy court had not yet reconsidered

mandatory abstention prior to ordering discovery; that the

bankruptcy court lacked subject matter jurisdiction and

personal jurisdiction over the objecting defendants; and that

the foreign disclosure order would require defendants to

violate the bank customer confidentiality and privacy laws of

some 30 separate countries under whose laws defendants are

organized.

After briefing and a limited oral argument held

June 26, 2012, the bankruptcy court issued the foreign

disclosure order over the objections of several hundred

defendants.  Critical to the Court's reasoning in the order was

the adoption of the foreign representative's arguments raised

for the first time in his reply brief that a provision of the

relevant form subscription agreements entitled "Office of

Foreign Assets Control" (hereinafter the "OFAC provision")

constituted a general waiver by the defendants of any bank

customer confidentiality or privacy law compliance

requirements.

On June 29, 2012, this Court granted a stay of the

foreign disclosure order pending resolution of the requests for

leave to appeal and, if granted, a decision on the merits of

any appeal.

C76efaic

1          And so that's how we find ourselves here today,

2     counsel.

3          For Mr. Moloney, the foreign representative states

4     that we haven't really made out a case here for an

5     interlocutory appeal.  And I note in your papers, when you're

6     talking about the pure question of law, you talk about comity,

7     abstention, subject matter jurisdiction, personal jurisdiction,

8     and then when you're talking about substantial grounds for

9     difference of opinion, then you talk to me about the discovery

10    order.

11         What's the issue for the interlocutory appeal, and why

12    is an interlocutory appeal appropriate in this case?

13         MR. MOLONEY:  Your Honor, I would say interlocutory

14    appeal is appropriate for the following reasons.

15         And for the record, it's Tom Moloney on behalf of the

16    defendants who were mentioned earlier.

17         This is not a standard discovery order in two

18    respects.  One is --

19         THE COURT:  And you're talking now about the discovery

20    order, despite what you put in the brief about pure questions

21    of law, right?

22         MR. MOLONEY:  Well, the order raises -- the legal

23    questions go to the propriety of the order.

24         THE COURT:  Okay.  But in that section of the brief,

25    you really didn't mention the discovery order.

C76efaic

1           MR. MOLONEY:  Right.

2           THE COURT:  Right.  That's why I was confused.

3           MR. MOLONEY:  Okay.  Sorry about that, your Honor.

4           But we are focused on a discovery order, and we think

5    the discovery order presents issues that this Court should

6    review for two reasons.  One is I think this Court has inherent

7    jurisdiction to determine whether or not its order sending the

8    case back to Judge Lifland had been followed.  And so to the

9    extent Judge Lifland did not follow your order to -- as a first

10   order of business consider mandatory abstention, I think we

11   can --

12          THE COURT:  That has nothing to do with the discovery

13   order.

14          MR. MOLONEY:  Well, he had the discovery order remand

15   and mandatory abstention.  We've opposed the discovery order

16   because we said he had to pursue -- if he was going to do

17   anything in this case, the only thing he could do was mandatory

18   abstention -- that was a threshold issue -- not enter the

19   discovery order.  And we think your Honor has inherent

20   jurisdiction to enforce your own order, which was to remand the

21   case and be sure of the first order of the business of the

22   bankruptcy court was to focus on the remand issue, which your

23   Honor has properly set up as a threshold issue that the Court

24   needed to decide.

25          THE COURT:  Even if I have inherent jurisdiction

C76efaic

1    doesn't mean that an interlocutory appeal is appropriate,

2    right?

3            MR. MOLONEY:  I think after *Stern v. Marshall*, your

4    Honor, I think that the workload between the district court and

5    the bankruptcy court -- I think courts need to -- district

6    court is undoubtedly going to be thinking about what's the

7    appropriate workload between the two.  And I don't think the

8    same standard, 1292(b) standard that would apply between this

9    Court and the Second Circuit necessarily governs this Court and

10   the bankruptcy court.

11           THE COURT:  I didn't see that anywhere in your brief.

12           MR. MOLONEY:  Well, it's exceptional circumstance

13   argument, your Honor, that we've cited.  The *WorldCom* case

14   that, for exceptional circumstances such as an order which

15   commanded this number of people here, that violates the laws of

16   30 countries --

17           THE COURT:  The lawyers just want to come in on a

18   Friday morning.

19           MR. MOLONEY:  Your Honor, I think those exceptional

20   circumstances -- I think this Court has power as a supervisory

21   court to look at the 1292(b) standard through the lens of

22   whether or not this is the type of issue that provides

23   exceptional circumstances that you should review it.  If we

24   want to be --

25           THE COURT:  Everybody knows that exceptional

C76efaic

1     circumstances are a reason for an interlocutory appeal.

2             But let me go back again.  I mean, I think we have to

3     do it -- let's do it on the three factors first, because that's

4     what initially confused me.

5             MR. MOLONEY:  Okay.  On the controlling questions of

6     law, I think the controlling question of law is the Court did

7     not -- I have a hand-out, if I could, your Honor, that might

8     help.

9             THE COURT:  I can hardly wait.  How many pages is it?

10            MR. MOLONEY:  It's 18.  Thank you, your Honor.  I have

11    a lot of extra copies for your law clerks.

12            THE COURT:  Do your opponents have this?

13            MR. MOLTON:  Judge, it was predistributed.

14            THE COURT:  Oh, good.  For everybody except me.

15            MR. MOLONEY:  Sorry, your Honor.

16            Well, we anticipate your Honor's first question on the

17    second page, your Honor, which is the fundamental errors of

18    law, which is the -- and we think that these are three

19    fundamental errors of law the Court may by entering.  The

20    discovery order, it does not first deal with the threshold

21    issues, including the one your Honor directed the Court to

22    consider.

23            Number two, it improperly read the subscription

24    agreements, which then led it to basically, as a result of its

25    improper reading the subscription agreements, it led it to --

C76efaic

```
1    failed to engage in the comity analysis that is required by

2    Supreme Court jurisprudence and a jurisprudence of the Second

3    Circuit.

4              THE COURT:  Let me just ask you what you mean by that.

5    You said that by improperly reading what the Court referred to

6    as the consent provisions in the subscription agreement and the

7    private placement memorandum, that led the Court to fail to

8    undertake a comity analysis?

9              MR. MOLONEY:  Right.  Before --

10             THE COURT:  I'm not quite sure I see the relationship

11   there.  I'm not sure it makes a difference, but I'm not sure I

12   see the relationship.

13             MR. MOLONEY:  The Court felt that because we had

14   waived -- "we" being our collective clients -- had waived the

15   rights under these privacy statutes, did not have to then

16   engage into analysis of -- whatever those statutes' interests

17   were sufficiently serious that they took precedence over the

18   interest of the BVI in pursuing a claim, which is not yet

19   recognized, which was really the --

20             THE COURT:  I see, because the Court found that the

21   defendants consented?

22             MR. MOLONEY:  Your Honor, it's basically -- it was

23   basically a Gordian knot that Judge Lifland cut through.  He

24   thought, but we think improperly, but misreading a provision of

25   subscription agreement.
```

C76efaic

1           THE COURT:  Okay.  Go ahead.

2           MR. MOLONEY:  So we think those were the fundamental

3    errors of law.  Then obviously in a case with this many parties

4    involved, and with this much money involved, billions of

5    dollars, the idea that you're going to nail -- complicate it by

6    adding on hundreds of additional parties if they find the names

7    of these beneficial owners -- because they're not proposing to

8    substitute these people.  They want to add these people as

9    defendants --

10          THE COURT:  So this is the pain in the neck argument.

11          MR. MOLONEY:  Well, it goes to the question of

12   wherever this is going to materially advance litigation by

13   cutting through this, not adding these people, not getting into

14   a collateral sanctions litigation, which is the next step, and

15   appeals of the sanctions litigation; because I'll tell you now

16   that for the number of jurisdictions, people will not comply

17   with this order.  And Switzerland, in Luxembourg, it's a very

18   difficult decision as to whether or not these people go to jail

19   if they comply.

20          So we're going to have collateral litigation.  So that

21   this could potentially cut through that Gordian knot, and it

22   would be dispositive of the case, your Honor, if the Court goes

23   back and applies the abstention analysis your Honor suggested

24   they apply with the Second Circuit's additional learning in

25   *Parmalat*, where even after the Court had actually decided the

C76efaic

case here, or it's a affected timely adjudication issue.

           Here we have a situation where before they want to go
forward, they may have an uncertain appeal in the Privy Council
in England.  There's no reason why this case cannot be
officially litigated in state court, why we have to be in
federal court here.  So I think the abstention analysis is
quite simple and that would dispose of the case.

           So I think that satisfies the traditional 1292(b)
standards, though I think in this case there are exceptional
circumstances.  The violation of the laws of all these
countries, I think, would be appropriate to mandamus as well,
but I don't think the Court needs to go that far because I
think the relationship between the district court and the
bankruptcy court allows for review, even when the relationship
between the district court and the Second Circuit might have a
different standard.  I think --

           THE COURT:  Okay.

           MR. MOLONEY:  I think that's our position on --

           THE COURT:  Okay.  Mr. Molton, what do you say on the
interlocutory appeal issue?

           MR. MOLTON:  Good morning, your Honor.

           And by the way, Judge, at various times my colleague,
May Orenstein, on various issues will be assisting me and
speaking to various issues, to the extent you raise them.

           THE COURT:  Okay.

C76efaic

1          MR. MOLTON:  A number of things, Judge.  You know, I

2     don't believe Mr. Moloney has made a compelling case on the

3     leave to appeal standard.  I don't believe it exists here.  And

4     if I could just get to a number of things.

5          First of all, I just want to, for the sake of the

6     record, because I think we sometimes conflate the remand cases

7     with the other cases who are movants or joinders, the bottom

8     line is whatever the remand argument is and how your Honor

9     views it, it has no applicability to the vast majority of the

10     defendants and actions to whom the disclosure order applies.

11     And I think we gave your Honor some schedules to assist your

12     Honor and your Honor's chambers in that regard.  So when your

13     Honor is talking about 41 cases in this room, there are many

14     more than them.

15          THE COURT:  I can see that.

16          MR. MOLTON:  So in any event, your Honor, on the

17     first, dealing with Mr. Moloney's pure -- we think with respect

18     to the controlling question, there is no controlling question

19     of law.  Your Honor only has to go back to your decision from

20     last year, when we were all here on a hot summer day, and your

21     Honor I think remarked as well at the vast amount of folks

22     here.  We seem --

23          THE COURT:  Vast number.

24          MR. MOLTON:  Vast number.  Thank you, Judge.  Of folks

25     here.

C76efaic

1          The bottom line is the issue of core or not, *Stern v.*

2    *Marshall* are very different from the analysis that has to be

3    taken vis-a-vis whether there's a conflict with the various

4    issues of law, the various issues of foreign law which have

5    been alleged and whether they have each defendant.  And if your

6    Honor turns to Exhibit A or --

7          THE COURT:  By the way, now that you mention that,

8    anybody who asks for 40 pages in a brief, gets it and then

9    tells me that I adopt all these other briefs and appendices is

10   really pushing it.

11         MR. MOLTON:  Judge, we just referred you in a simple

12   way to the record below.  I apologize.

13         THE COURT:  On an expedited motion.  I know it's not

14   your fault it's expedited, but a couple of examples would have

15   sufficed.

16         MR. MOLTON:  Okay.  I'm sorry, your Honor.  We were

17   just trying to assist the Court on that.  We could have annexed

18   them to the declaration, and they wouldn't --

19         THE COURT:  Even that wouldn't have helped me.  The

20   point is we're trying to get through this.

21         MR. MOLTON:  Got it.

22         THE COURT:  Okay.

23         MR. MOLTON:  But the bottom line is that all of these

24   issues require an evaluation of the record.  And except

25   maybe -- you know, just purely if Mr. Moloney refers to the

C76efaic

1    remand issue, and I'll get to that.

2                  THE COURT:  Refers to the?

3                  MR. MOLTON:  The remand issue.  And I'm going to get

4    to that first, your Honor.  We believe that's a red herring.

5    We've proffered to your Honor the various cases that say that

6    while mandate is controlling as to the matters within its

7    compass on remand, a lower court is free as to other issues.

8    We cited Supreme Court cases on that.

9                  THE COURT:  Why don't we talk about what he said.

10                 Mr. Moloney said, although he has it down on number

11   two, that the fundamental error of law that defendants are

12   complaining about is the bankruptcy court's supposedly

13   incorrect reading of the subscription agreement consent.

14                 MR. MOLTON:  Okay.  And to the extent, Judge, we can

15   get to that, Ms. Orenstein can address those in particular, but

16   let me take your Honor through that.  We think that's wrong.

17                 First of all, the subscription agreement was included

18   in our moving papers.  To the extent that my friends in the

19   audience threw out bank secrecy laws, we, of course, then in

20   the reply papers refer to the consent.  So I just want to note

21   that the subscription agreement was no surprise to the

22   defendants.

23                 And by the way, we have a situation here also where

24   the defendants are kind of playing hide and seek because they

25   have their records.  They have in their records subscription

C76efaic

```
 1    agreements, to the extent they -- we haven't found them.  They
 2    may also have, and I'll get to it in a minute, your Honor,
 3    consent from their customers.
 4              THE COURT:  I read that footnote.  I read the
 5    footnote.
 6              MR. MOLTON:  Good.  Okay.  But we haven't had a chance
 7    to --
 8              THE COURT:  But we're at the interlocutory appeal
 9    question now.  And again, Mr. Moloney says that the incorrect
10    reading of th OFAC provision is a pure question of law, etc.,
11    etc., etc.
12              MR. MOLTON:  Judge, we think there's more to it than
13    that.  It requires an analysis of all of what was called the
14    transaction documents, which in paragraph one of the
15    subscription agreement includes the private placement
16    memorandum as well as the articles of association, all of which
17    shall --
18              THE COURT:  Okay.  But they say that that's
19    misinterpreted also.
20              MR. MOLTON:  Okay.  Judge --
21              THE COURT:  The private placement memorandum.
22              MR. MOLTON:  Well, the private placement memorandum
23    contains a clear provision.  And we have a hand-out --
24              THE COURT:  Well, we can get to that.  We're talking
25    about interlocutory appeal, whether we should all be sitting
```

C76efaic

1    here on a Friday morning.

2              MR. MOLTON:  Judge, it is not a pure question of law.

3    To the extent that it creates any requirement of contract

4    construction that may include other provisions of the

5    agreement, it may include, to the extent that your Honor

6    disagrees with Judge Lifland and finds an ambiguity that

7    requires a searching of the record, we believe that the

8    documents tendered to your Honor create a situation where there

9    is a record that has to be looked at on particular

10   circumstances with respect to not only that one provision with

11   that one heading above it, but in connection with the entire

12   transaction and possibly the entire --

13             THE COURT:  Well, in arguing to Judge Lifland, though,

14   you only relied on the provisions in the subscription

15   agreement.  I think you didn't even rely on the private

16   placement memorandum.

17             So your argument was that this is clean, and you,

18   Judge Lifland, can do this without searching the record,

19   without going to other transactions, without even going to

20   other documents.  Wasn't that your argument to him, and now

21   you're changing your mind, tell me it's real complicated?

22             MS. ORENSTEIN:  May I?

23             THE COURT:  Ms. Orenstein, go ahead.

24             MS. ORENSTEIN:  Your Honor, I believe that in our

25   papers below we made reference to the private placement

C76efaic

1    memorandum.

2              THE COURT:  Okay.  But you didn't make an argument

3    that this was a huge contract construction problem that was not

4    relatively clear and simple.  You argued it was clear and

5    simple.

6              MS. ORENSTEIN:  The point that we claimed was clear

7    and simple -- I don't believe we said anything was clear and

8    simple.  It's actually a very complicated case, but --

9              THE COURT:  I didn't say the case.  We're talking

10   about the issue, not the case.

11             MS. ORENSTEIN:  The focus of our argument on the

12   papers below was the failure of the defendants to meet their

13   burden to establish an authentic conflict between foreign law

14   and --

15             THE COURT:  I'm talking about what Mr. Molton is

16   talking to me about now.  He's telling me that the question of

17   law that Mr. Moloney relies on is far too complicated to be

18   done on an interlocutory appeal.  That's not what you people

19   argued to the bankruptcy court.  You urged the bankruptcy court

20   to come to your conclusion.

21             MS. ORENSTEIN:  We absolutely urged the bankruptcy

22   court to deny the motion of the defendants, but we did so not

23   on the basis of a pure issue of law, but because we had

24   carefully reviewed on the individualized basis the arguments

25   that were made in opposition to the motion based upon foreign

C76efaic

1    secrecy law.  And we've --

2              THE COURT:  Your position to the bankruptcy court on

3    the interpretation, the contract construction of the

4    subscription agreement, and you tell me the PPM as well, was

5    that it's simple, can be done in the face of the document as

6    opposed to what Mr. Molton just told me has to go into other

7    transactions, search the record, blah, blah, blah.

8              MS. ORENSTEIN:  I'm not trying to be evasive, but our

9    arguments below were somewhat different and not entirely

10   reflected in Judge Lifland's order.  So to the extent that --

11   Judge Lifland's order, I agree with you, focuses on an

12   interpretation of the subscription agreements.  And I will

13   mention in that regard that one of the factors Judge Lifland

14   took into account in issuing the order on the basis of the

15   subscription agreements was that the parties -- he perceived

16   the parties to be financially sophisticated parties, banks.  So

17   that is a factual issue that Judge Lifland for his part

18   included in his analysis and was relevant to his reliance upon

19   a subscription agreement.  For example --

20             THE COURT:  So you think that there's a good faith

21   question that these defendants aren't financially

22   sophisticated?  Is that what you're trying to tell me?

23             MS. ORENSTEIN:  By no means.

24             THE COURT:  Thank goodness.  Okay.  Good.  I feel

25   better.

C76efaic

          MS. ORENSTEIN:  I'm just indicating a respect to which

the judge did not rely entirely upon a bald reading of the

contract terms, whereas if the parties had not been

sophisticated, he may very well have found that he could not --

          THE COURT:  If my mother had wheels, she'd be a

trolley car.  I'm only talking about the question of whether

the reading of the so-called consent provisions is a pure

question of law or not.

          MS. ORENSTEIN:  It's frequently said that the

interpretation of a clear contract is a matter of law.

          THE COURT:  This, today, this --

          MS. ORENSTEIN:  Is a matter of law.  And I would then,

on that basis, find that the interpretation of a contract is a

matter of law.  I do not think that the fact that it is a

matter of law, or even the fact that it may be a pure question

of law, satisfies the requirement that it be a controlling

issue of law under the jurisprudence relating to that factor on

interlocutory appeal.

          THE COURT:  Well, if this is what they're complaining

about, this is the order they say is subject to an

interlocutory appeal, then we have to look at this one, right,

and go through the other factors?

          MS. ORENSTEIN:  That's correct.  But I'm referring to

the fact that there is Second Circuit jurisprudence which I

believe that we do cite in our brief that indicates that

C76efaic

contract issues, notwithstanding being questions of law, may

not be of sufficient import or general significance to meet the

standard under case law to be also a controlling issue of law.

        THE COURT:  Right.  Might or might not.

        MS. ORENSTEIN:  Right, which is a term of art.  And I

will note in their brief that in their section on controlling

issue of law, they -- and this is their brief seeking leave

from you to appeal -- they did not identify the contract

interpretation as the controlling issue of law.  They

identified two other issues.

        THE COURT:  You listen to my question.  That's not

fair.

        MS. ORENSTEIN:  They identified two other issues as

controlling issues of law.  The first was whether --

        THE COURT:  I got it.  I got the whole thing.

        All right.  What else on this?

        MS. ORENSTEIN:  I'm sorry, your Honor.  On the issue

of -- there was an issue of law --

        THE COURT:  I want to understand what your position is

on what Mr. Moloney just told me about interlocutory appeal.

        MR. MOLTON:  Judge, I'll move on.  I do think, even

reviewing the contract with respect to paragraph one, it does

incorporate other provisions, other documents.  And that

informs the Court's interpretation thereof, especially with

respect to the provision you're referring to.

C76efaic

1        And accordingly, if your Honor believes that Judge

2   Lifland focused merely on one clause, that doesn't mean that

3   that's the pure issue of law that something more vis-a-vis the

4   contract has to be looked at.  And I'll move on.

5        THE COURT:  Well, okay.  But you keep telling me maybe

6   yes, maybe no.  What's your position on why it's not?

7        MR. MOLTON:  Well, Judge, we don't think it's a

8   controlling question because there's -- we don't think that it

9   will basically have any impact on the -- first of all, we don't

10  think there's any substantial grounds for difference of

11  opinion.  And we don't believe also that it will materially

12  affect, advance or dispose of the termination or the

13  disposition of --

14       THE COURT:  What about what Mr. Moloney said?  If the

15  disclosure is not made, then regardless of what happens on the

16  merits, an enormous amount of ancillary litigation will be

17  avoided.  And the termination of the -- the resolution of this

18  case will be significantly speeded up.

19       MR. MOLTON:  Judge, I think that's all speculation.

20  They had it in them to come forth and say, listen, we've got

21  consents or we don't have consents.  They don't say either.  So

22  to the extent they have consents, those consents would

23  basically waive those very --

24       THE COURT:  Perhaps, maybe, if.  We don't know.

25       MR. MOLTON:  But the bottom line --

C76efaic

1    THE COURT:  But there's no doubt that if the foreign

2  disclosure order were reversed, an enormous amount of

3  litigation, even -- let's just say they cave and produce the

4  information.  Then you would be amending.  Those parties would

5  be coming in.  We'd have a whole bunch of additional

6  litigation.  There can't be any serious question about that.

7    MR. MOLTON:  That's fair, your Honor.

8    THE COURT:  That's the way you want it to go?

9    MR. MOLTON:  That's fair, your Honor, but I think

10  that's -- you know, as we progress this litigation, that's what

11  this litigation was going to be focusing on, is basically to

12  the extent that defendants are going to be claiming that

13  they're conduits and they have no liability to us, everybody

14  knew that we would be seeking who --

15    THE COURT:  What difference does that make in what

16  we're talking about?

17    MR. MOLTON:  Well, Judge, the bottom line is by not

18  giving us this disclosure order now, we're severely

19  handicapping the foreign representative.  As your Honor noted,

20  we have the --

21    THE COURT:  Is that part of the interlocutory appeal

22  analysis?  I don't think so.

23    MR. MOLTON:  No.  The bottom line, Judge, is we don't

24  think that there's been any material showing, any competent

25  showing, other than speculation as to what might happen, to the

30
C76efaic

1    extent this disclosure order is granted.  Indeed, your Honor --

2    and I think we've put in the papers before your Honor issued

3    the stay -- we were getting communications from various parties

4    to work things out.

5         And one of our declarations to your Honor, we tendered

6    to your Honor, that we did, in fact, work out resolutions of

7    these issues with various parties.  All we're looking at, your

8    Honor, is basically the progress of a material litigation

9    dealing with a remarkable situation, a remarkable circumstance.

10        THE COURT:  Sounds extraordinary to me.

11        MR. MOLTON:  It is.  It is.  And you know --

12        THE COURT:  Ms. Reporter, did you get that?  Yes.

13        MR. MOLTON:  And as your Honor knows, the same sort of

14   issues in different guises or different issues are being played

15   out with other aspects of Madoff related litigation.  So we're

16   all trying to do the best we can, those who have fiduciary

17   duties to their stakeholders in progressing litigation for the

18   benefit of those stakeholders.

19        THE COURT:  May I ask you this please, Mr. Molton.

20        MR. MOLTON:  I'm sorry, Judge?

21        THE COURT:  Go ahead.  Did you want to finish up?

22        MR. MOLTON:  No.  Lesson number one is never stop a

23   judge from asking a question.

24        THE COURT:  I sure hope all of my wonderful interns

25   are listening to this.  We talked about this yesterday.

C76efaic

1          Given what was before the bankruptcy court, you know,

2     in the 8 billion and 12 affidavits from all these banks

3     saying -- and the Swiss law experts and all these people, I

4     understand Mr. Moloney also to be arguing that it was gross and

5     disgusting error not to have engaged in the comity analysis

6     prior to entering the foreign disclosure order.  Do you say

7     that is a pure question of law or not?

8          MR. MOLTON:  No, Judge.  That clearly is not, because

9     in order for -- as your Honor knows from the case law we cited

10    in our brief, in order for a comity analysis to be required,

11    there has to be an actual conflict.  And that's a case-by-case

12    analysis.  And I know your Honor doesn't want to refer me --

13    you don't want me to refer to Exhibit A again, but we tried to

14    do that in Exhibit A to show the Court below -- go ahead.  I'm

15    sorry.

16          THE COURT:  I guess I wasn't so clear why you were

17    saying there wasn't a conflict.  I read the portion in your

18    brief about the affidavit from somebody or other on foreign law

19    to the effect that if there was consent, then, fine, it's not a

20    violation.  But at least some of these people seem to think

21    that there isn't consent and, thus, the foreign disclosure

22    order, in fact, violates the various bank secrecy laws of all

23    these countries.

24          MR. MOLTON:  If I can ask Ms. Orenstein to respond to

25    that --

C76efaic

1          THE COURT:  Of course.

2          MR. MOLTON:  -- because she has a handle on this.

3          THE COURT:  She knows Exhibit A.

4          MS. ORENSTEIN:  Okay.  I believe that what your Honor

5   is referring to as the sort of featured foreign law declarant

6   in the brief is a gentleman by the name of Tissier, who was

7   addressing his comments to case law which is referred to by a

8   seminal case of *Tournier*.  And *Tournier* establishes or sets

9   forth the basic elements of bank law, of bank confidentiality

10  and has been adopted in many of the common law jurisdictions.

11          With respect to the *Tournier* doctrine, a point was not

12  actually bottomed on consent.  With respect to the *Tournier*

13  doctrine, our assertions was bottomed on the description of the

14  doctrine as allowing foreign banks to produce confidential

15  information or to be relieved of their obligation to hold

16  information confidential based upon an order of a court of

17  competent jurisdiction.  And many of the common law defendants

18  put in similar affidavits or joined in the declaration of

19  Professor Tissier.  And on that basis, we argue that they have

20  failed to establish that there is a conflict between the order

21  of the US court, which -- if it is a court of competent

22  jurisdiction, and the bank confidentiality laws to which

23  they're subject in the common law countries.  So that was a

24  declaration that we featured early in our brief.

25          Our arguments are somewhat different with respect to

C76efaic

1    the declarants who were opining with respect to civil law

2    jurisdictions.

3              THE COURT:  But even taking that declaration at face

4    value, don't both the Supreme Court and the Second Circuit tell

5    us that before entering such an order, the US court should

6    engage in the comity analysis?

7              MS. ORENSTEIN:  I don't think I agree with that

8    statement, because I think if, in fact, foreign law provides

9    that a foreign bank, a bank situated in Guernsey or the Bahamas

10   or wherever it is, you may produce confidential client

11   information in response to an order of a competent

12   jurisdiction -- order of a court with competent jurisdiction,

13   and that provided there exists such an order, there is no

14   violation of foreign law.  I think that eliminates the

15   conflict.

16             THE COURT:  So you think that the US court should

17   engage in no analysis of the respective countries' interests;

18   you know, the analysis that the Supreme Court talked about in

19   the *Aerospatiale* case, how can that be?  We should just pop off

20   and say it's okay, so we don't care what their laws are, we

21   don't care?  No comity analysis at all, that's your position?

22             MS. ORENSTEIN:  It's not an issue of not caring and no

23   comity analysis at all.  It's a question of proceeding as --

24   there's a first step, your Honor, and the first step is to

25   identify the existence of the conflict.

C76efaic

1          Once there is a conflict, what does a conflict mean?

2     The conflict means that the foreign party cannot comply with

3     the US order and at the same time comply with the foreign law.

4     It's between the rock and the hard place.  That's the essence

5     of the contract.

6          THE COURT:  So is there any case interpreting the

7     requirements for a comity analysis in the manner you suggest?

8          MS. ORENSTEIN:  Yes, your Honor.  I believe we cite to

9     several cases in our brief stating that -- I'm being assisted

10    here.  Is this our brief below, to this Court?

11         THE COURT:  What page are you looking at, ma'am,

12    counsel?

13         MS. ORENSTEIN:  We're not quite focused yet.

14         THE COURT:  I was looking at 23 or thereabouts, 24.

15         MS. ORENSTEIN:  Okay.  I have I think -- okay.  If

16    your Honor would refer to page 16 of our brief before you, we

17    cite to -- I have a quote from *Strauss v. Credit Lyonais*,

18    243 F.R.D. 199.

19         THE COURT:  I didn't think that that enunciated the

20    theory that you are espousing here.  That is, that if the

21    foreign entity could make the production pursuant to an order

22    of a US court without liability, then no comity analysis was

23    required.

24         MS. ORENSTEIN:  Your Honor, I think that proposition

25    that you just stated derives from combining the Tissier

C76efaic

declaration with cases that I'm having difficulty finding but I

believe it to be the case -- and it could be Maxwell, there are

other cases cited.  I believe the issue is more extensively

drafted in our motion before Judge Lifland, the point being the

initial burden on the defendants to establish in the first

instance the conflict.

          And I do apologize.  I heard your chiding with regard

to the incorporation of the briefs below, but, in fact, in the

order that the defendants provided to you in connection with

this proceeding, they proposed that there would be no further

briefing.  And we would be relying on the papers below, and we

thought it was appropriate.  I really would --

          THE COURT:  Only to needle you a little bit, then why

did you need 40 pages?  But you don't have to answer that.

That was a rhetorical question.

          MS. ORENSTEIN:  Actually, we'd be happy to answer it.

I think the defendants covered a lot of issues.  Many of them

had different issues and different bases upon which they

thought they're entitled to some relief.  And we wanted to

touch upon all of them.

          But I would like to keep the record open during a

break and identify, you know, for the record those other cases

that we believe more directly address the issue of the two-step

analysis that a court will undertake before reaching the comity

issue, because we think, in fact, that it's a relatively well

C76efaic

1    established progression of analysis.

2              THE COURT:  Thank you.  Off the record.

3              (Discussion held off the record)

4              THE COURT:  Mr. Molton, did you have anything you

5    wished to add on the interlocutory appeal analysis?

6              MR. MOLTON:  Judge, I think we dealt with the three

7    things that Mr. Moloney talked about, remand, improperly

8    reading subscription agreements and comity.

9              With respect to remand, I just want to refer back to

10   the record.  We tried in December to progress these cases to a

11   point where the remand issue would then be opened up and heard

12   by Judge Lifland and also the jurisdictional question would

13   have been resolved.  The defendants -- not only the remand

14   defendants, but all defendants resisted that.  And the stay was

15   continued.  And it is at the present date subject to the

16   limited --

17             THE COURT:  Remind me what you did in connection with

18   that effort.

19             MR. MOLTON:  Yes, Judge.  In December 5th, the Eastern

20   Caribbean Court of Appeals granted the foreign representatives

21   sanction to continue and progress these actions.  We have the

22   order, I think it's part of our record but I have --

23             THE COURT:  Just tell me.

24             MR. MOLTON:  Okay.  I have it here, if your Honor

25   wants it.  But what the Eastern Caribbean Court of Appeals did

C76efaic

is the companies in liquidation have sanction from that court

to take such steps as are necessary to further prosecute

expeditiously their common law claims in the United States and

elsewhere.

         And then paragraph two talks about expedite -- to take

such steps as necessary to prosecute expeditiously in the

United States bankruptcy court the BVI avoidance claim.  So we

abstained, even after the BVI court's preliminary issues

judgment that happened in the fall of 2011, we abstained

sanction from the presiding court to continue here with these

cases.

         THE COURT:  So what did you do then?

         MR. MOLTON:  We then asked Judge Lifland to lift the

stay in December of 2011.  And that's part of the record that's

in front of your Honor, part of the record on appeal, as well

as referenced in our brief.  And not only what I would call the

bankruptcy court file defendants, but the remand defendants

themselves said, oppose the motion, in a letter submitted on

behalf of all of them by my friend Mr. Moloney.

         At that point in time there was an appeal pending in

the Eastern Caribbean Court of Appeals, and there was also, as

your Honor knows, your Honor granted us 1292(b) certification

to proceed to the Court of Appeals.  And that was still pending

at that point as well.  Judge Lifland wrote status quo,

continued basically on the stay order that he had issued in

C76efaic

 1    October.  So we had wanted to progress these cases and deal

 2    with all of these issues.

 3         THE COURT:  Let me ask you this:  We're going to get

 4    to this -- we might get to this later on.  This is not really

 5    an interlocutory appeal question, but since you mention it, one

 6    of the points the defendants make is that the reason we're in

 7    such a time bind now is that the foreign representative failed

 8    to proceed through the Hague Convention for this very

 9    discovery.  What prevented the foreign representative from

10    doing that?

11         MR. MOLTON:  We didn't think we needed to.  And I'm

12    going to let Ms. Orenstein proceed.

13         MS. ORENSTEIN:  Your Honor, before addressing that

14    issue, belatedly I'd just like to identify on page 20 of the

15    brief, 21 of our brief before this Court, the citation to

16    *British International Insurance v. Seguros La Republica*, 2000

17    WL 713057 at page 21, a party resisting disclosure on the basis

18    of foreign law, quote, has the burden of showing that such

19    foreign law actually bars the production at issue.

20         And then similarly, another cite to *Shanghai Bank*

21    *Corp.*

22         THE COURT:  Got it.

23         MS. ORENSTEIN:  With respect to the Hague Evidence

24    Convention, the law is quite clear that it is not mandatory in

25    all circumstances, that it --

C76efaic

  1          THE COURT:  Everybody agrees to that.  The question

  2    is, why didn't we wait?  We're now yelling and screaming about

  3    the statute of -- the toll running out July 22.  We could have

  4    done this two years ago.

  5          MS. ORENSTEIN:  For several reasons.  First of all, we

  6    don't think that the procedures under the Hague Evidence

  7    Convention are really appropriate to the very limited and

  8    targeted disclosure that we sought here.

  9          THE COURT:  What does that mean?

 10          MS. ORENSTEIN:  The Hague Evidence Convention appears

 11    to be more typically used to develop -- to get extensive

 12    documents to obtain --

 13          THE COURT:  That's not an answer.  You want simple

 14    little answers.  Why is it not appropriate to use the Hague

 15    Convention for that?

 16          MS. ORENSTEIN:  I believe that for purposes of what is

 17    conceived of as preanswer and limited, targeted discovery, that

 18    the Hague Convention is not generally used.

 19          THE COURT:  Who cares?  It may be, right?

 20          MS. ORENSTEIN:  Well, another consideration that we

 21    took into account was that not all of the defendants are in

 22    countries that are subject to the Hague Evidence Convention.

 23          THE COURT:  But most of them are.

 24          MS. ORENSTEIN:  Many of them are, but quite a few of

 25    them are not.  So --

C76efaic

1          THE COURT:  So then we limit it as to none.

2          MS. ORENSTEIN:  Certainly expense was an issue that we

3     would be, you know, commencing any number of proceedings in

4     foreign countries that were not necessarily likely to be

5     productive.

6          And that is another issue, your Honor, similar to the

7     issue I discussed before, is that courts have repeatedly found

8     that the defendants have a burden of indicating that production

9     will, in fact, be productive under the Hague Evidence

10    Convention.  And here, based upon our analysis of the issues,

11    we determined that many of the same bank secrecy objections

12    could be advanced in the context of the Hague Evidence

13    Convention so that we could -- in other words, it's a different

14    set of procedures.  It's not necessarily an open sesame to be

15    able to get past the very same objections that we're facing in

16    this court.  And that was another point that went into our

17    consideration of not proceeding with those -- with that

18    process.

19          And the other, your Honor, is frankly, we think that

20    we are differently situated in this case, based on the

21    subscription agreements relative to defendants in other cases,

22    where courts have more heavily weighed or more heavily taken

23    into account the argument based on the Hague Evidence

24    Convention.  In this situation --

25          THE COURT:  What does that mean?  Does that mean

C76efaic

 1   because you say you have consent here, it's better?

 2              MS. ORENSTEIN:  We do believe that because we have --

 3              THE COURT:  Does it mean something other than that?

 4              MS. ORENSTEIN:  Well, it's one little addition to

 5   that.  We have consent to jurisdiction, so we have a

 6   contractual commitment to litigate in this jurisdiction.

 7              And in addition, we have an agreement that states that

 8   it's governed by New York law.  And I think that we can say

 9   that essentially the decision between the Hague Evidence

10   Convention and the Federal Rules of Civil Procedure is

11   fundamentally an issue of what procedures are applicable to a

12   particular proceeding.  And we feel that it's a completely

13   legitimate argument to say that where a party has contractually

14   committed to the US as a jurisdiction to litigate a claim and,

15   moreover, has contractually committed that US law will apply to

16   that claim, that there is a distinction in that situation to

17   other situations where courts, in weighing the various factors,

18   have insisted that the party seeking discovery proceed through

19   the Hague.

20              THE COURT:  Okay.

21              MR. MOLTON:  Judge, if I may just add to that for one

22   second.

23              As stated, 221 of the 230 objecting defendants signed

24   the long forms.  Now, whatever argument is said about, well,

25   very few number that -- there may be different provisions

C76efaic

1    vis-a-vis consent.  I think that was raised by a number of what

2    we call special circumstance defendants.  All of them have the

3    consent to jurisdiction clause that Ms. Orenstein mentioned.

4    And accordingly, I just wanted to note that for the record.

5            The remaining nine objectors, five are in the United

6    States and there's four remaining.

7            THE COURT:  Okay.

8            MR. MOLTON:  So that's where we are.

9            THE COURT:  Anything else on interlocutory appeal?

10           MR. MOLTON:  I think I'm done.  Just one more -- I hit

11   my remand point, Judge.  And I know Mr. Moloney said that

12   they're going to be subjected to all sorts of horrible,

13   horrible things in Switzerland and elsewhere.  My

14   understanding, it's their burden to come forward in their

15   papers below with that evidence.  It's my understanding they

16   didn't do so.  So I know Mr. Moloney likes to say that, but

17   there's no proof of that.

18           THE COURT:  Thank you.

19           Mr. Moloney, what else do you want to say on

20   interlocutory appeal?  Counsel says that you haven't come

21   forward below with evidence that making the production required

22   would subject your clients to heinous results.

23           MR. MOLONEY:  Actually, the only evidence below on

24   that point was from our expert witnesses, your Honor.  And if

25   you go to -- this may be helpful, page 15 of our slide, we

C76efaic

1    quote here for the next three pages the specific portions of

2    the declarations that are in the record that go specifically to

3    this issue.  Beginning with Switzerland, where we have two

4    declarations, one by Professor Luc Thevenoz and one by

5    Professor Alain Macaluso, who say that we will violate Swiss

6    law.

7            We also have a letter which is in the record as

8    exhibit to Mr. Keeley's declaration from the Swiss government

9    saying we will violate the law, in this case by producing the

10   documents in Switzerland.  So I don't believe as to Switzerland

11   there can be any particular question.  We have the Swiss

12   government and we have two experts.  There's no evidence of any

13   sort on the other side, other than what they relied on below,

14   which is this waiver language in the agreement.

15           THE COURT:  All right.

16           MR. MOLONEY:  Which your Honor correctly identified as

17   a controlling issue of law.

18           THE COURT:  Anything else?  Go ahead.

19           MR. MOLONEY:  The debt on Luxembourg, same situation.

20   We have two expert witnesses.  Again, these are criminal

21   statutes so that the jurisprudence here in the Second Circuit

22   is that this indicates a very strong -- comity interest aside,

23   these are not blocking statutes.

24           THE COURT:  That was Judge Pollock's case.  He seems

25   to be hidden by the screen here, but he's looking at you.

C76efaic

1          MR. MOLONEY:  And those are not blocking statutes.

2     And the section -- you know, so I think that I think -- we have

3     more obviously in our briefs in here, but we've done it for

4     every single jurisdiction, we've shown that there's an actual

5     conflict and there's no declarations on the other side.

6          Second point I would make, your Honor, is the other

7     fundamental issue of law that's here is the failure to consider

8     threshold issues.  And it's not simply abstention; it includes

9     abstention.  And on the abstention issue, I think they're just

10    playing fast and loose with the Court, frankly.  They moved for

11    Judge Lifland to --

12          THE COURT:  May I defer this discussion until we get,

13    if we get farther.  I want to know if you have anything else to

14    say on interlocutory appeal, please.

15          MR. MOLONEY:  Well, just that a threshold issue is a

16    fundamental issue.  And putting aside abstention, when they

17    referred to the fact that the Court had jurisdiction in the

18    common law state that may provide a protection, we would have

19    to decide whether we have jurisdiction.  The very first step of

20    the comity analysis requires you to decide if you have

21    jurisdiction.  Until a state finds it has jurisdiction over the

22    clause and the person, you have no comity analysis.

23          And so that is the threshold question.  The Court

24    skipped that step.  Then it skipped the second step, which is

25    to go do the comity analysis.  The cases they point you to, and

C76efaic

1    I commend you to look at them -- I'm sure you will -- the

2    Credit Lyonais case.

3            THE COURT:  You commend me.

4            MR. MOLONEY:  The Credit Lyonais case they refer to,

5    my partner, Larry Friedman, litigated.  The Court engaged in

6    extensive comity analysis.  They've gone to the end of comity

7    analysis, because the Court concluded something.  It didn't do

8    analysis.  It went through an analysis.  In order to reach the

9    conclusion that the order will be okay and that you're not

10   going to offend foreign law, you need to do an analysis.  The

11   Court completely skipped that step.  So that was the second

12   fundamental error of law.

13           And obviously your Honor is correct, and we apologize,

14   we should have put it in that section of our brief, but

15   obviously the misreading of the document is a fundamental error

16   of law.  Those, I think, are the only thing I would add.  And

17   I'm not sure it goes to the fundamental error of law point, but

18   if we ever get to the later points, the Madoff trustees using

19   the Hague Convention for the very purpose they're seeking

20   discovery here.  And it's obviously US law, the Hague

21   Convention, so that we think failure to use the Hague

22   Convention was never part of the fundamental error of law of

23   skipping this comity stage.

24           THE COURT:  Okay.  Counsel, we'll take five minutes

25   and I'll see you back here then.

C76efaic

1          (Recess)

2          THE COURT:  Apparently we all agree that this Court

3     has discretion to grant an interlocutory appeal of an order of

4     the bankruptcy court.  28 U.S.C. Section 158(a)(3).  In

5     exercising that discretion, courts have looked for guidance to

6     28 U.S.C. Section 1292(b) and have granted such leave where, A,

7     the order involves a controlling question of law; B, there is a

8     substantial ground for difference of opinion; and C, an

9     immediate appeal may materially advance the ultimate

10    termination of the litigation.

11          *In re Adelphia Communications Corp.* 333 B.R. 649, 658

12    (S.D.N.Y. 2005).  "The 'question of law' must refer to a 'pure'

13    question of law that the reviewing court could decide quickly

14    and cleanly, without having to study the record.  The question

15    must also be 'controlling' in the sense that reversal of the

16    bankruptcy court would terminate the action or, at a minimum,

17    that determination of the issue on appeal would materially

18    affect the litigation's outcome." *Id.*  A "substantial ground

19    for a difference of opinion must arise out of a genuine doubt

20    as to the correct applicable legal standard relied on in the

21    order.  Substantial ground would exist if the issue is

22    difficult and of first impression." *Id.* at 658-59.  Normally,

23    leave to appeal is granted where "exceptional circumstances"

24    are present.  *Id.* at 658.

25          The Court is mindful that interlocutory appeal from

C76efaic

discovery orders is generally disfavored.  See *Chase Manhattan*

*Bank N.A. v. Turner & Newell, PLC*, 964 F.3d 159, 166 (2d Cir.

1992).  However, this presumption can be overcome either by

satisfaction of the Section 1292(b) factors or a showing of

"manifest abuse of discretion."  See *Xerox Corp. v. SCM Corp.*,

534 F.2d 1031, 1031-32 (2d Cir. 1976).

        The Court is convinced that the dispute over the need

for the bankruptcy court to undertake an international comity

analysis before ordering foreign discovery is a "'pure'

question of law that the reviewing court could decide quickly

and cleanly without having to study the record."  See *In re*

*Adelphia Communications Corp.*, 333 B.R. at 658.  Moreover,

there is "genuine doubt as to the correct applicable legal

standard relied on in the order," *Id.*, insofar as precedence in

the United States Supreme Court and the Court of Appeals appear

to compel the comity analysis defendants seek, see e.g.,

*Societe Nationale Industrielle Aerospatiale*, 482 U.S. 522,

543-44. & n.28 (1987):  *United States v. First National City*

*Bank*, 396 F.2d 897, 902 (2d Cir. 1968) (Where two states may

enforce their respective rules of law, "each state is required

by international law to consider, in good faith, moderating the

exercise of its enforcement jurisdiction" should the comity

factors be met); see also *In re Maxwell Communications Corp.,*

*PLC v.Homan*, 93 F.3d 1036, 1048 (2d Cir. 1996) ("Comity is

especially important in the context of the bankruptcy code.").

C76efaic

1           The Court is also aware that these precedents require

2      the finding of a true conflict of law.  *Aerospatiale*, 482 U.S.

3      at 555 (Blackmun, J., concurring in part).  That is, of course,

4      itself a question of law.  In this case it is made no less so

5      by the bankruptcy court's reliance on the language of the form

6      subscription agreements.  That language is readily reviewable

7      and is not the sort of contract construction that would require

8      this Court to delve extensively into the case record.  *Compare*

9      *with Bank of New York Trust NA v. Franklin Advisors, Inc.*, 674

10     F.Supp. 2d 458, 474 (S.D.N.Y. 2009) (discussing appellate

11     review of contract construction involving significant issues of

12     disputed material fact.)  It also does appear that this

13     language was the sole basis on which the bankruptcy court

14     declined to undertake the comity analysis at issue.

15          The same "genuine doubt" exists as to the ability of

16     the bankruptcy court to order foreign disclosures without first

17     addressing the threshold questions of subject matter

18     jurisdiction and mandatory abstention.  Federal courts are

19     courts of limited jurisdiction and "the validity of an order of

20     a federal court depends upon that Court's having jurisdiction

21     over both the subject matter and the parties."  *Insurance Corp.*

22     *of Ireland Limited v. Compagnie des Bauxites de Guinee,* 456

23     U.S. 694, 701 (1982); see also *Southern New England Telephone*

24     *Company*, 624 F.3d 123, 132 (2d Cir. 2010).  This Court has

25     already cautioned in this case that "there are substantial

C76efaic

grounds for differences of opinion not only with respect to the

bankruptcy court's determination as to jurisdiction, but also

with respect to its determination as to abstention" and that

"the determination of subject matter jurisdiction is not only

of utmost importance in federal court, but also would

materially affect the litigation's outcome." See *In re*

*Fairfield Sentry*, 458 B.R. at 673; see also *Wynn v. AC*

*Rochester*, 273 F.3d 153, 157, (2d Cir. 2001).  That defendants

did not object to prior orders of the bankruptcy court after

the original remand, including the stay of proceedings there

pending appeal, is of little relevance owing both to the

respective natures of the orders and their consequences.  In

any event, whether denominated a formal ruling on the subject

matter jurisdiction motions or not, to the extent that a

finding of subject matter jurisdiction is step one in a

required comity analysis, the questions are interrelated.

        Also, as counsel acknowledge, this Court need only

apply the Section 1292(b) factors as guidelines and has

discretion to grant such an appeal in "exceptional

circumstances."  See *In re Adelphia Communications Corp.*, 333

B.R. at 658; *In re WorldCom Inc.*, 08 Civ 10354, 2009 WL 2215296

at *3 (S.D.N.Y. July 23, 2009).  The Court agrees that in light

of its prior order remanding this case for a determination on

mandatory abstention, the defendants' ongoing challenge to both

subject matter and personal jurisdiction, the affirmed

C76efaic

dismissal of the foreign representative's claims in the BVI

courts, the colorable dispute over the bankruptcy court's

interpretation of the subscription agreement language and the

overarching specter of compelling foreign discovery that could

violate as many as 30 international banking privacy regimes,

such circumstances likely exist here.

          In short, this case presents the sort of exceptional

circumstances other courts have found when granting such a

motion.  See *In re DPH Holdings Corp.*, 437 B.R. 88, 93-94

(S.D.N.Y. 2010).  Accordingly, the court grants the defendants'

motions for leave to appeal.

          Mr. Moloney, what would you need to talk to me about

on the merits?

          MR. MOLONEY:  Yes, your Honor.

          THE COURT:  One of the things I'd ask you to cover, if

you would, is your point about where you ask and others ask the

Court to instruct the bankruptcy court on the sequence in which

the bankruptcy court should address the various outstanding

issues.  I'm not so sure I'm aware I have authority permitting

this Court to do that, but you can start wherever you want.

          MR. MOLONEY:  That's a good place to start, your

Honor.  And actually, I have a slide that kind of talks about

that.

          THE COURT:  I can hardly wait.

          MR. MOLONEY:  If we look at slide 6, Justice Ginsberg

C76efaic

writing for a unanimous court in *Sinochem* basically held that

in order to determine which one of the audience denying routes

that the Court could take, whether it be forum non conveniens,

abstention, jurisdiction or subject matter jurisdiction, that

basically the court could do whatever is most convenient to it.

And she cites with authority a decision by the -- I think was a

DC circuit involving -- and we did not cite that in a brief but

it's actually where the quote comes from -- substantive law

declaring power.  And I read it yesterday in Papandreou, who's

a Greek Prime Minister, where what the DC circuit said was

basically the lower court should use some sort of triage and

decide what's the easiest one to decide.  And whatever is

easiest to decide in order to eliminate it, the Court has

discretion to do that.

        So, your Honor, unless your Honor was to decide these

issues yourself -- which I think would be your prerogative,

particularly on the abstention issue -- but if you directed it

back to Judge Lifland, I think he could have discretion, but

he'd have to use that discretion to go through the issue that's

easiest to decide, which I think is going to be the abstention

issue.  I think it would be an abuse of that discretion to go

to a more complicated issue such as subject matter

jurisdiction.

        THE COURT:  So do we agree that it is not clear that

this Court can order or should order the bankruptcy court what

C76efaic

1       order in which to resolve the various issues pending before it?

2                MR. MOLONEY:  With one caveat:  In the Papandreou

3       case, and I think that probably applies here, when the DC

4       circuit, they were reviewing the court below by mandamus, they

5       said, the one issue you should decide first is you should

6       decide your power before you decide comity.  And I think it

7       also makes sense here, that before you decide --

8                THE COURT:  But is that related to the fact that

9       included in the comity analysis is whether or not the Court has

10      jurisdiction?

11               MR. MOLONEY:  I think that's right.  It's the very

12      first step of the analysis, so I think -- so that -- but that

13      could end the question.  Since it's part of the analysis, I

14      think the Court should decide its -- I think the comity issues

15      only -- and the restatement section, which your Honor quoted

16      from, it starts right before the section you quoted by saying,

17      when two states are charged with jurisdiction over a matter.

18      So I think you start there.  And if the Court finds that

19      there's no jurisdiction, it doesn't need to go further.

20               So I think that's the starting point.  And I think the

21      rational starting point there would be unless the bankruptcy

22      court believes it can dismiss the case more easily by starting

23      somewhere else, it's abstention, then subject matter

24      jurisdiction, then personal jurisdiction.  But I think if the

25      bankruptcy court could dismiss the case more easily by jumping

C76efaic

1    to personal jurisdiction, I think the law is it has that

2    discretion.

3          THE COURT:  Okay.  As I noted, the sole basis on which

4    the bankruptcy court ruled was its reading of the language

5    primarily in the subscription agreement, but the language which

6    it held constituted a consent to the disclosure.  Would you

7    like to talk to me about that?

8          MR. MOLONEY:  Yes, your Honor.  And if -- I have that

9    language on page eight of -- actually, I have that language

10   from page nine, slide on page nine.

11         And actually, before I even focus on that language,

12   let me deal with it, an argument that was an implicit waiver by

13   simply having these arrangements.  That which is another

14   argument which they make, and I'm sure they'll raise when they

15   stand up, is even if this language isn't a waiver, simply by

16   entering into these agreements there's a waiver.  These

17   agreements were carefully structured, your Honor, in order to

18   permit and to recognize the foreign privacy laws.  And the

19   private placement memorandum, which I don't know why they find

20   any solace in that whatsoever, but if you looked at pages 25

21   and 26 of that memorandum, which is attached to their papers

22   and opening pages --

23         THE COURT:  I have it.

24         MR. MOLONEY:  -- it indicates that if investments made

25   by a qualified financial institution, which all of our clients

C76efaic

```
1    are.  I think everyone in this room is probably a qualified
2    financial institution.  If you do that, then you don't need to
3    give any of the information.  So that these investments are set
4    up to permit anonymity and to respect foreign bank secrecy
5    laws.  That's the way they're set up, to say that implicit in
6    entering into this arrangement was some waiver of privacy is
7    completely contrary to the whole way this was marketed or set
8    up.  It was set up deliberately for foreign banks basically to
9    be able to bring their clients into these investments without
10   disclosing their identities.  That was the way this BVI entity
11   set up this.
12        Now, the specific language which they look at, they
13   say that we should have anticipated the argument that this
14   language could be read as a waiver.  But it's not that all
15   those law firms you mentioned at the beginning of this case
16   were unable to read this language.  I don't see how anyone
17   could possibly read this language that way.  And I still don't
18   understand how Judge Lifland read the language that way.
19        THE COURT:  Okay.
20        MR. MOLONEY:  I think the language is pretty clear.
21        THE COURT:  Why don't we ask counsel to explain why it
22   is he says Judge Lifland was correct.
23        MR. MOLONEY:  Can I make one more point first?
24        THE COURT:  Sure.
25        MR. MOLONEY:  Just to get it out of the way.  The
```

C76efaic

argument --

THE COURT:  Only because it's not useful to say I don't understand how we can do this.

MR. MOLONEY:  Sorry, your Honor.

The other two points, then, I would say, is that if you look at the slide ten, which is the other language he's relying on, they're basically saying, look, we don't have a remedy to see our argument they're making.  They're making arguments here that were not arguments that Judge Lifland relied on, but they're saying, look, if you don't read it this way, there's no remedy.

But there is a remedy.  The remedy is against the bank.  To the extent that these indemnities are not enforceable, our banks are making these representations and they know who we are.  So they don't need to know the name of the beneficial holders in order to enforce these clauses and to have a remedy.  If they have an additional remedy against those parties, if they know there the bank may have a remedy against these parties because they both --

THE COURT:  A remedy for what?

MR. MOLONEY:  Their argument in their brief is this subscription agreement doesn't make sense because if they don't know they have indemnities that run to them and they have rights to run to them, if they don't know who to enforce them against, then there's no remedy.

C76efaic

1          THE COURT:  If the agreement says the subscriber is

2     subscribing both on its behalf and on behalf of the beneficial

3     owner.

4          MR. MOLONEY:  Correct.  So the subscriber is on the

5     hook, so they have that remedy.  And then the offering

6     memorandum, which we quote from on page 11 in detail, makes it

7     clear that these -- that what we're dealing with here are

8     basically OFAC regulations that are dealing with anti-money

9     laundering situations and that are dealing with terrorist

10    situations.  And it also provides the specific remedy that the

11    fund has against the beneficial holder in the event that it

12    becomes uncomfortable with having a beneficial holder, doesn't

13    feel it has enough information about the holder.  It says it

14    can give them back their money or freeze their redemption.  It

15    doesn't say it can compel their identity.  It does -- so that

16    does not provide that remedy.

17         To go back, and I apologize for my statement that I

18    don't know how I could read it this way on the OFAC provision.

19    This is a standard provision, your Honor.  There will be no

20    more bank secrecy cases if this OFAC provision -- which is

21    going to be in every single agreement that banks enter into all

22    over the world post 9/11 -- if that provision meant that all

23    bank secrecy is waived, then there are no more bank secrecy

24    statutes; or that the US policy, which this provision strongly

25    enforces, being able to make sure we can enforce OFAC rights,

C76efaic

 1    will not be as respected as it is right now.  So I think that

 2    this interpretation is potentially extremely dangerous for US

 3    interests.

 4            THE COURT:  Okay.  Mr. Molton, Ms. Orenstein?

 5            MR. MOLTON:  Your Honor, Ms. Orenstein is going to

 6    cover this.

 7            MS. ORENSTEIN:  All right.

 8            THE COURT:  Counsel says he doesn't know how it could

 9    be read this way.  And, I must say, seeing the headings does

10    tend to color one's view of this.

11            MS. ORENSTEIN:  Understood.  And I'm going to -- I am

12    eager to demonstrate for you how.

13            THE COURT:  I can hardly wait.

14            MS. ORENSTEIN:  So I would just like to take us

15    through a few different provisions of the agreement.

16            THE COURT:  Yes, ma'am.

17            MS. ORENSTEIN:  And I have Exhibit 45, which is the

18    Banco Santander.  If it's convenient to the Court, I'll hand it

19    up.

20            THE COURT:  I have it already.

21            MS. ORENSTEIN:  All right.  I'd first like to start

22    with paragraph -- well, first of all, just to take you to the

23    end of the agreement, page 10 we see that Banco Santander

24    Suisse is identified as the actual subscriber.  And on the

25    following page, or the very last page of the document, we have

C76efaic

what appears to be two authorized signatories who signed for

Banco Santander as subscriber.

THE COURT:  So why do I care?

MS. ORENSTEIN:  Keeping in mind Banco Santander is the

subscriber, we then turn to paragraph 27 of the agreement.  If

subscriber is a representative.  If subscriber is subscribing

as trustee, agent, representative or nominee of another person,

defined as the beneficial shareholder, subscriber agrees that

the representations and agreements herein are made by

subscriber with respect to itself and the beneficial

shareholder.

We think that this provision is of critical

importance.  Why is that?  We believe that pursuant to this

provision, that each and every other agreement and

representation of the agreement which is made binding upon and

pertains to the subscriber thereby becomes binding upon and

pertains to the beneficial holder.

So how does this operate?  Looking now back at the

beginning of the agreement, at paragraph 1 thereof, we see that

the final sentence of that paragraph provides that the

subscriber subscribes for the shares pursuant to the terms

herein the memorandum, which is a reference to the private

placement memorandum and the funds' other organizational

documents.

And we interpret that provision, then read in

C76efaic

conjunction with paragraph 27 of the agreement, to mean that

the beneficial holder likewise subscribes, pursuant to the

terms of this agreement and the other instruments.

         We then go down to paragraph five of the agreement.

We come to a series of representations.  There are several

enumerated paragraphs here, and they cover actually a broad

swath of territory.  Section 5A contains a representation that

subscriber is not a US person under regulation S of the SEC.

As we interpret this provision, it includes a representation

that, likewise, the beneficial holders are not US persons for

purposes of regulation S.  And I believe it to be the case

under our securities laws that it would be improper for a

non-US person to, in effect, shield the identity of the

beneficial holders who were US persons in order to take

advantage of this representation.

         That representation is then followed by a series of

other representations that are of great significance in

establishing the eligibility not only of the subscriber, but

also of each beneficial holder to invest in the fund.  So we

have the commodity and exchange representation, which is

somewhat similar to the reg. S representation.  Then we have an

eligibility criteria under 5C that is established under BVI

law, pursuant to which the professional investor -- the

investor must have professional status.

         Continuing through the document, we then see other

C76efaic

representations contained in paragraph seven.  One of them

pertains to the receipt and having -- the receipt, the

understanding, the comprehension of the subscriber of the fund

documents.  And we would submit again, by operation of 27, that

this is intended to be binding upon the beneficial holder and

to preclude certain kinds of lawsuits that would be precluded

by acknowledgment of having read the fund materials and

accepted the risks that were stated therein, and that these

provisions were significant and concluded for that purpose and

are binding on the beneficial holders.

Paragraph 8 is somewhat similar.  It's a

representation regarding subscriber's sophistication and

financial condition.  We think it is the only logical reading

of the agreement that representations with respect to

subscriber sophistication and financial condition were intended

to be made by the beneficial holder.

THE COURT:  I get the point.

MS. ORENSTEIN:  Okay.  We get to the point, your

Honor, the point is found in paragraph 29 of the agreement,

pursuant to which we get an answer to the question of, well,

what does the fund do about all of this if it needs to

establish the eligibility not merely of its subscribers but

also of its beneficial holders?

Paragraph 29 of the agreement provides that the fund

may request from the subscriber such additional information as

C76efaic

1    it may deem necessary to evaluate the eligibility of this

2    subscriber to acquire shares, and may request from time to time

3    such information as it may deem necessary to determine the

4    eligibility of subscriber to hold shares or to enable the fund

5    to determine its compliance with applicable regulatory

6    requirements or its tax status.  And the subscriber agrees to

7    provide such information as may reasonably be requested.

8            This provision is not narrowly related to OFAC, but

9    this is intended to enable the subscriber essentially upon --

10   not the subscriber, to enable the fund essentially, upon

11   request, to obtain whatever information it needs to ascertain

12   the eligibility of the subscriber and the beneficial holder,

13   because --

14           THE COURT:  So which eligibility requirement are we

15   under here?

16           MS. ORENSTEIN:  We are not under any eligibility

17   requirement here.  The point I'm making is not that pursuant to

18   these proceedings we are seeking specific performance of the

19   subscription agreement.  Our point is different than that.

20           Our point is that if you look at the foreign bank

21   secrecy laws, you see that the purpose of those foreign bank

22   secrecy laws is to entrust confidential information.  And it's

23   to protect the secrecy of confidential information.  What is

24   confidential information?  Very often these bank secrecy laws

25   are less than completely lucid as to what it is.  But as I

C76efaic

1  understand it, it encompasses information that the banks are

2  either entrusted with by their customers, or that the banks

3  come to know by virtue of the customer relationships, that the

4  banks are not free to disclose to third parties.  That is the

5  essence of confidentiality.  It's the entrustment of

6  information that is subject to -- that is a purpose other than

7  for disclosure, and, in fact, where it's understood that that

8  information cannot and will not be disclosed.

9        And so the significance of the subscription agreement

10  and these provisions is not that we're seeking to enforce the

11  subscription agreement in these proceedings; it goes to the

12  very heart of whether or not the provision of this information

13  pursuant to -- which was whether this information fits within

14  the definition of confidential, secret, protected information

15  under the various foreign privacy laws that have been invoked

16  by the defendants.

17        THE COURT:  Then why are you reading me all this?  I'm

18  not sure I get the connection between the two.

19        MS. ORENSTEIN:  The connection goes back to what I was

20  addressing before, and that is the issue of whether the Court

21  committed legal error by not reaching the issue of comity and

22  whether or not the Court was correct in finding that the

23  defendants had failed to meet their burden to show --

24        THE COURT:  Are you arguing that paragraph 29 is a

25  consent or a waiver?

C76efaic

1          MS. ORENSTEIN:  I'm arguing that paragraph 29 must be

2     considered by any foreign law declarant in an opinion that is a

3     finding that there is a conflict between foreign law and --

4          THE COURT:  Why is it relevant to this case?  The

5     information is not being sought to evaluate the eligibility of

6     the subscriber to acquire shares.  Then why is it -- I don't

7     see why it's relevant.

8          MS. ORENSTEIN:  It's relevant to the nature of the

9     information that the banks have, which they're saying --

10          THE COURT:  I don't know what that means.

11          MS. ORENSTEIN:  It's relevant to whether that

12     information that they possess about the beneficial holders of

13     the shares is confidential information or secret information.

14          THE COURT:  How is it relevant?

15          MS. ORENSTEIN:  Where a party imparts to a bank or the

16     bank comes into information in a context which would not

17     preclude its further disclosure, I submit there's a substantial

18     issue under the foreign law statutes that have been cited here

19     as to whether that information comes within the purview of the

20     foreign bank secrecy laws.

21          THE COURT:  You haven't answered my question as to why

22     paragraph 29 is relevant to anything.

23          MS. ORENSTEIN:  Paragraph 29 is binding upon each

24     beneficial holder --

25          THE COURT:  Nobody is arguing that.  Why is it

C76efaic

1    relevant to this case?

2           MS. ORENSTEIN:  Because each beneficial holder, by

3    authorizing the defendant subscriber to enter into this

4    agreement on its behalf, contemplated the possibility of

5    further disclosure of the information.

6           THE COURT:  Sure, but what further disclosure?

7    Disclosure, quote, necessary to evaluate the eligibility of the

8    subscriber to acquire shares.  And by reading subscriber I mean

9    to include beneficial holder.  How is that relevant here?

10          MS. ORENSTEIN:  I would submit that the issue of

11   whether a foreign party who agrees to the use of their

12   confidential information for any purpose in connection with a

13   commercial transaction raises an issue of waiver and consent --

14          THE COURT:  Counsel, counsel, they didn't agree for

15   any purpose.  They agreed to disclose such information as may

16   be deemed necessary to evaluate the eligibility of the

17   subscriber or the beneficial holder to acquire shares.  That's

18   not what we're doing here, is it?

19          MS. ORENSTEIN:  I agree, your Honor.  That's not what

20   we're doing here.

21          THE COURT:  Then why do I even care about this?

22          MS. ORENSTEIN:  I'm struggling to explain my point --

23          THE COURT:  I know that.  There's a reason for that,

24   counsel.

25          MS. ORENSTEIN:  When I look at the definitions under

C76efaic

```
1    the foreign law statutes and they talk about secrets, to my

2    mind, when somebody has agreed can be disclosed for any

3    purpose.

4              THE COURT:  But that ain't this.  What we're talking

5    about here ain't this.  So it's irrelevant.

6              Okay, next?  Is there more?

7              MS. ORENSTEIN:  No, your Honor.

8              THE COURT:  Okay.  Did you want to speak at all about

9    the subscription agreement or the private placement memorandum

10   which the bankruptcy court relied on, anybody?  Anybody at the

11   plaintiff's table?

12             MR. MOLTON:  Yes.

13             THE COURT:  Yes, sir.

14             MR. MOLTON:  Judge, just to take what Ms. Orenstein

15   says, I think that what she's trying to say is that by entering

16   into this agreement, and by authorizing the subscriber, the

17   named subscriber to enter into this agreement in the context of

18   the entire transaction documents -- and I know Mr. Moloney

19   showed you the PPM, but the PPM is clearly worded in a way that

20   says, hey, by the way, to the extent that the funds need

21   information, you're going -- you know, that information is

22   subject to disclosure.

23             THE COURT:  It doesn't actually say, to the extent the

24   funds need information.  It talks about as part of the funds or

25   the administrator's responsibility for the prevention of money
```

C76efaic

 1    laundering.  That's what it says.  How is that this?  How is

 2    this that?

 3          MR. MOLTON:  Investment manager, page 25.  And I know

 4    you have it in front of you.

 5          THE COURT:  I have it right here.

 6          MR. MOLTON:  Reserves the right to request such

 7    information that's necessary to verify the identity of a

 8    subscriber and underlying --

 9          THE COURT:  Do you want this taken down?

10          MR. MOLTON:  No, it's okay.

11          THE COURT:  Well, you don't have to take it down,

12    Ms. Reporter.  That's okay.

13          MR. MOLTON:  No, Judge -- I'm saying in the context of

14    all the transaction documents, a beneficial owner understands

15    that by subscribing and by investing in the Fairfield funds for

16    that point would appear to be a very lucrative investment in

17    Madoff, they were basically consenting to their identities and

18    certain information being disclosed for a host of purposes.  I

19    believe your --

20          THE COURT:  But none of them is the purpose you have

21    here.

22          MR. MOLTON:  Well, the purpose we have here, Judge, is

23    to find out who our beneficial owners are.

24          THE COURT:  Doesn't say that.  Show me where it says

25    that.  It says as part of the fund or the administrator's

C76efaic

1   responsibility for the prevention of money laundering.  And the

2   subscription agreement language that you rely on is in the

3   Office of Foreign Assets Control portion.  It says nothing

4   about general disclosure.

5          MR. MOLTON:  Your Honor, if your Honor is going to

6   read those agreements in the context of all those provisions,

7   and what --

8          THE COURT:  Tell me what I'm missing.  Tell me why I'm

9   wrong.

10          MR. MOLTON:  I think, your Honor, in the context of

11   reading the entire agreement and giving fair weight to each and

12   every provision, as you must do --

13          THE COURT:  Tell me what I'm missing.

14          MR. MOLTON:  You're missing the general tenor that the

15   beneficiary understands that his, her, its identity is subject

16   to disclosure.

17          THE COURT:  Under certain terms and conditions to

18   determine whether or not the beneficial owner is eligible to

19   subscribe, to counter money laundering and to counter

20   terrorism, is what I find.  Tell me where I'm wrong.

21          MR. MOLTON:  On page -- paragraph 22, your Honor.

22          THE COURT:  Of which, please, sir?

23          MR. MOLTON:  Of the main subscription agreement.

24          THE COURT:  Yes, sir.

25          MR. MOLTON:  The fund may disclose the information

C76efaic

1     about subscriber that is contained herein as the fund deems

2     necessary to comply with any applicable law as required in any

3     suit, action or proceeding.

4               THE COURT:  Okay.

5               MR. MOLTON:  And, Judge, if the bottom line is that

6     you're looking for a provision that says in the context of a

7     suit by the funds and/or the liquidator for overpayment of --

8               THE COURT:  I'm not looking for that.

9               MR. MOLTON:  It's not there.

10              THE COURT:  Of course not.  I don't disagree with you,

11    counsel.  But the question is:  Is there any consent to

12    disclosure that is not cabined by eligibility -- the purposes,

13    eligibility to invest, anti-money laundering, antiterrorism?

14              MR. MOLTON:  Paragraph 22, your Honor, I believe sets

15    forth a general --

16              THE COURT:  Okay.  Mr. Moloney, counsel says paragraph

17    22.

18              MR. MOLONEY:  Let me first address 22.  And if I can,

19    I'd like to take a step back, too.

20              THE COURT:  Okay.  Let's hear 22 first.

21              MR. MOLONEY:  First start with 22.  That says that any

22    information they have they can disclose.  I don't have a

23    problem with that.  They don't have the information.  That's

24    why we're here.

25              THE COURT:  Mr. Molton?  I thought that would take

C76efaic

1    longer, but okay.

2           MR. MOLTON:  Judge, again, I think, read in the

3    context of the entire agreement, this agreement -- this would

4    be superfluous, this provision.  It would be a nullity with

5    respect to beneficial owners, if Mr. Moloney's very restricted

6    reading of it is correct.  What it would mean is that we would

7    have no way -- the funds would have no way, as required in any

8    suit, action or proceeding, to disclose or to discover the

9    identity of beneficial holders for the purpose of complying

10   with this provision.

11          Again, going back to what Ms. Orenstein said, the

12   subscriber subscribes on behalf of the beneficial owner --

13          THE COURT:  I got that.

14          MR. MOLTON:  -- as if they are the beneficial

15   owners --

16          THE COURT:  I understand that.

17          MR. MOLTON:  So what Mr. Moloney and his argument is

18   basically asking your Honor to accept is that this agreement,

19   this agreement provides no consent by the beneficial owner to

20   have its identity made known to the fund for any --

21          THE COURT:  Yeah, it does.  Any purpose other than --

22          MR. MOLTON:  For any purpose other than whatever your

23   Honor --

24          THE COURT:  Eligibility.

25          MR. MOLTON:  Eligibility.

C76efaic

```
 1              THE COURT:  Anti-money laundering --

 2              MR. MOLTON:  Yeah.  And I don't think you can read

 3       this -- I think any -- now, Mr. Moloney talked about, you know,

 4       what goes on in banking history and what should be surmised.

 5       So I'm going to take his lead and tell --

 6              MR. MOLONEY:  I thought I gave a very short answer,

 7       your Honor.

 8              THE COURT:  I know.  Come on.  This is important.

 9              MR. MOLTON:  The bottom line is that any subscriber

10       who reads these documents, who reads the PPM, who understands,

11       reads all these provisions, much -- some of them standalone,

12       clearly understands that they are consenting to disclosure of

13       certain information on the fund's request.  I don't think it's

14       a fair reading --

15              THE COURT:  It doesn't say that here.  That's not what

16       paragraph 22 says.

17              MR. MOLTON:  No, but I think the fair implication of

18       it, as I just said, paragraph 22 in the context of the

19       agreement as a whole provides the funds with an opportunity to

20       obtain information as to --

21              THE COURT:  It doesn't say attain.

22              MR. MOLTON:  I understand.

23              THE COURT:  Let's assume that we incorporate

24       subscriber and/or beneficial owner.  It still doesn't say that

25       the funds may compel the disclosure of information from the
```

C76efaic

1    beneficial owners or about the beneficial owners.

2              MR. MOLTON:  Judge, I think that's a fairly restricted

3    reading of a number of transaction documents.

4              THE COURT:  Tell me what I'm reading wrong.

5              MR. MOLTON:  You're right.  It doesn't say that,

6    Judge.  I agree.  It says the fund may disclose information

7    about subscriber that is contained herein and is deemed

8    necessary to comply with applicable laws required --

9              THE COURT:  Well, compare it, please, to paragraph 29.

10   The fund may request from the subscriber such additional

11   information as it may deem necessary to evaluate the

12   eligibility of the subscriber to acquire shares.  That's where

13   we're finding out that the fund may request, but it doesn't say

14   that in 22.

15             MR. MOLTON:  No, it doesn't.  And what I'm saying,

16   your Honor, and I've said --

17             THE COURT:  Who drafted these documents?  The fund.

18             MR. MOLTON:  These documents were no doubt drafted by

19   the fund, I am sure.

20             THE COURT:  None of the lawyers in this room, I trust.

21             MR. MOLTON:  Maybe we won't go there.  I don't know,

22   Judge.

23             THE COURT:  I'm not criticizing the documents.  Go

24   ahead.

25             MR. MOLTON:  But in any event, I mean, I could say it

C76efaic

 1    five times, so I'm not going to belabor the point anymore.

 2              THE COURT:  I have the point.

 3              MR. MOLTON:  The bottom line is, as required to give

 4    every provision meaning in this --

 5              THE COURT:  I got it.

 6              MR. MOLTON:   -- complicated transaction that not only

 7    involves a subscription agreement but involves as well, going

 8    back to first principles of contract construction, what we're

 9    doing here is not looking at the whole, which basically says,

10    in order to conduct its business, the fund may have a need to

11    require disclosure of beneficiary identity or information.

12              THE COURT:  For certain purposes.

13              MR. MOLTON:  There were a number of purposes there,

14    but I don't think you can read 22 -- if you read it that 22

15    merely says that the only way I can get the information that

16    I'm seeking to or need to disclose is that I'm unable to get it

17    other than through the one, two, three specific provisions that

18    are contained in this paragraph, I believe renders 22 a

19    nullity, given its very broad wording.  It's clearly

20    contemplating a situation like a litigation, where the fund has

21    to disclose the identity or is compelled to disclose the

22    identity of its beneficial holders.  Put this litigation on the

23    side, forget about it, any litigation, any issue, wherever.

24    And what you're doing here is really taking the ability of the

25    fund and the meaning of this provision totally and eviscerating

C76efaic

it, if we're saying the only way you can get that information
is through one, two, three.

      I think, again, a fair reading of the agreement of the
whole, and giving force to its context and to the natural
understandings that flow from this agreement, clearly
envisioned and contemplate that a beneficial owner who decides
to give their money to one of these banks for investment in
Madoff clearly understands that they're subjecting themselves
to disclosure for a number of reasons not necessarily limited
to A, B and C.

      THE COURT:  Okay.

      MR. MOLTON:  Thanks.

      THE COURT:  Mr. Moloney, counsel says that paragraph
22 is a nullity if it is interpreted in the manner you suggest.

      MR. MOLONEY:  Your Honor, if I can address that
briefly.  I think this provision --

      THE COURT:  That's why I asked you.

      MR. MOLONEY:   -- is a shield rather than a sword.  By
that I mean that when the fund is required to disclose
information in litigation and has the information, it's ample
to do so.  And it's quite clear it says the fund may disclose
the information about the subscriber that's contained herein.
And I don't think the fact that the subscriber commits to -- on
behalf of itself and on behalf of beneficial holder means that
every time you see the word subscriber here, you read

C76efaic

1    beneficial holder, because --

2              THE COURT:  I'm just assuming it for the purposes of

3    argument here.

4              MR. MOLONEY:  But I think as a matter of reading the

5    contract as a whole, I think the word here means -- subscriber

6    means person who signed.  And I think the way this provision

7    works is if you read it in conjunction with the prior

8    provision, 21, the anti-money laundering provision, it says,

9    look, if the client appears on one of these OFAC list's bank,

10   the qualified financial institution which the architecture of

11   this agreement imposes a lot of obligations on, you have to

12   report that.  And then we, under 22, are free to report that to

13   everyone else.

14             If the person doesn't otherwise qualify -- and this is

15   where I would question your Honor's -- I think the cabining is

16   more narrow than your Honor suggested.  If the person just

17   doesn't qualify but doesn't fall on an OFAC list, I believe 21,

18   which is the specific provision dealing with what disclosures

19   you make, says that in the event of -- you're not giving

20   information, what the administrator may refuse to accept --

21   gives a whole bunch of remedies which the private placement

22   memo also says which involve freezing the money or giving the

23   money back.  But I think the only circumstance where they

24   actually could compel disclosure by the bank is if it's on an

25   OFAC regulation.  Doesn't really matter.  It's immaterial,

C76efaic

because the other circumstance isn't met here either.  They're

not questioning that these people were eligible.

       But I think if they have uncertainty about

eligibility, I think their remedy is at that point to freeze

the account or to give back the money.  I think the only

circumstance where they actually closely read in this agreement

get to get the information from the banks automatically,

including as a matter of right, is if it's on an OFAC list.

And that's understandable, given this.  Otherwise, the banks

have an absolute obligation to indemnify them if it turns out

that the beneficial holder doesn't meet these criteria, and the

banks on the whole is on the hook for that.  And they know who

the bank is, because the bank signed it, Banco Santander has

signed it and, therefore, they have a remedy against Banco

Santander.

       So the other point I make, just briefly, is that none

of these provisions were argued to Judge Lifland.  So in terms

of my argument that Section 21 could not be read to protect

their interests implicitly, the fact that we've now been

traipsing through the agreement looking at all these other

provisions means that Judge Lifland got this wrong.  Now

they're trying to find another provision as an after-fact, but

22 does not apply in this way.  And I think holistically this

whole arrangement doesn't make sense the way they're trying to

advance it to you.

C76efaic

1          And I want to take it a step back to their holistic

2     argument.  Holistically, as that section of private placement

3     memorandum I pointed you to, pages 25 and 26 again, sets up,

4     they set up a dual regime.  You either get the name of the

5     investor, and that person fills out this form, which is on page

6     26, and gives them all this information so the fund can make

7     sure they satisfy all these criteria, that's regime number one;

8     or regime number two, which is what we're all involved in is

9     that a qualified financial institution, a bank, gets this

10    information and then makes reps and warranties to the funds.

11         The whole point of this was them not to find out the

12    name of these beneficial holders and to respect these private

13    bank secrecy laws.  That's the whole point of this arrangement.

14    If they thought they had this right to the beneficial holders,

15    they wouldn't have this complicated arrangement.  They would

16    just have them sign the agreement and we wouldn't be here

17    today.

18              MR. MOLTON:  If I can, Judge.

19              THE COURT:  Yes, sir.

20              MR. MOLTON:  With all due respect to my friend

21    Mr. Moloney, that's not how it worked.  Basically these banks

22    acted as broker -- not brokers but sellers of Sentry shares.

23    They had their own interests and they made their own money.

24              THE COURT:  Okay.  How does that change?

25              MR. MOLTON:  What Mr. Moloney said, just responding to

C76efaic

1    his last point, bottom line is that the banks themselves went

2    out and sought customers for their own benefit.

3            THE COURT:  Banks always seek customers.

4            MR. MOLTON:  But just getting to -- I'm going to take

5    what Ms. Orenstein tried to convey and maybe didn't come

6    through, so I'm going to do my best to see if I can assist her

7    and assist you, your Honor, because the issue also isn't

8    whether the contract itself specifically allows or doesn't

9    allow this specific use thereof.  The issue is whether, under

10   the applicable foreign secrecy law, right, the provision of

11   information or disclosure of information disclosed a secret

12   that was entrusted to that bank.  What I think Ms. Orenstein

13   was trying to --

14           THE COURT:  I don't know why we're talking about this

15   in light of the affidavits of the foreign law experts, which

16   say if we turn over information responsive to the foreign

17   discovery order, we'll all be shot, or whatever they say.

18           So why is there a question?  I don't know why we're

19   talking about this.

20           MR. MOLTON:  Because what they're saying, Judge, what

21   they're saying as a predicate to that is that the applicable

22   law creates a liability for someone who intentionally divulges

23   a secret entrusted to him or her her debt.

24           THE COURT:  But all these foreign law guys are saying

25   that the information required to be disclosed by the order at

C76efaic

1    issue is such information.  It's information that we're not

2    permitted to disclose under our laws.

3           MR. MOLTON:  They're also saying, Judge, that -- and I

4    think Ms. Orenstein can speak to the particulars -- that if

5    there's a consent, that those issues go away.

6           THE COURT:  Okay.  So now we're back to looking at the

7    documents.

8           MR. MOLTON:  But the key is when -- but the provision

9    that you're looking for that says we have the right to compel

10   the disclosure of this particular piece of information doesn't

11   necessarily, ipso facto, mean that the subscriber -- that the

12   beneficial owners' provision of that information was done under

13   the understanding that it would be a secret; meaning, your

14   Honor, that the Swiss expert says Article 47 creates liability

15   for any person who intentionally divulges a secret entrusted to

16   him in his capacity as an officer, employee, agent or

17   liquidator of the bank.  If the beneficial owner is entrusting

18   that information and knowing that that information is subject

19   to disclosure, how is that a secret?  There's been no showing

20   other than conclusory statements.

21          THE COURT:  No.  The foreign law experts close the

22   loop by saying disclosure of this information will subject the

23   banks to criminal and civil liability.  That's where the loop

24   is closed.

25          And in your last statement you said something about

C76efaic

1    the beneficial holders having knowledge that the information

2    could be disclosed.  Well, yes, but under certain terms and

3    conditions:  Eligibility, anti-money laundering, etc., etc.

4          MR. MOLTON:  Well, again, your Honor, I think that the

5    way the agreement is structured, and for the reasons that I

6    said, at least with respect to the bank's secrecy laws that are

7    not the common law countries that are put on the side or the

8    blocking statutes that were put on the side; put those on the

9    side, and I hope we're not getting confused talking about those

10   issues, because those issues raise different issues, that the

11   bank subscribers themselves' disclosure of that information

12   that was tendered to them, with full understanding that it

13   could be disclosed for a host of reasons -- indeed, as I read

14   the paragraph that we just spent a lot of time on, 27, I think

15   it is -- you know, that there is an issue, your Honor, that the

16   loop is not closed.  There's no dispositive --

17         THE COURT:  But you and I are sitting here speculating

18   about that while the foreign law experts have given us their

19   conclusions.

20         MR. MOLTON:  Well, again, you're right, your Honor,

21   they have.  And the ones we're talking about talked about that.

22         THE COURT:  Well, there's no other affidavit saying,

23   no, that guy is wrong.

24         MR. MOLTON:  Well, we're relying, your Honor, on the

25   subscription agreements and the transaction documents.

C76efaic

1          THE COURT:  I understand that, and that's why we spent

2     a lot of time going over them.

3          MR. MOLTON:  At least for the bank secrecy, the pure

4     bank, the Luxembourg and Swiss, I think there is, and there may

5     be a few others.

6          But that's our position.  I don't know how many times

7     I can come around it, and I don't want to beat a dead horse,

8     but, you know, we really believe that the transaction

9     documents, in sum or substance, contemplate, anticipate and

10    many of the @privilege fence there and would be rendered

11    superfluous.  And it would lead to an absurd result that the

12    funds themselves are limited to requesting the identities of

13    their beneficial owners for the three -- we'll call it three --

14

15         THE COURT:  That we've talked about.

16         MR. MOLTON:  That's our position, Judge.

17         THE COURT:  Thank you.

18         Mr. Moloney, anything else on the step back?

19         MR. MOLONEY:  I'm sorry, on the step back?

20         THE COURT:  You wanted to take a step back, and I

21    think I forgot it.

22         MR. MOLONEY:  Okay.  I actually think I did that.

23    When I wanted to step back, I was talking about the

24    architecture of the entire agreement.  You know, that it

25    doesn't make -- it does make sense that this was set up to

C76efaic

```
 1    permit these foreign secrets to be in accord with these foreign

 2    secrecy laws, with the one exception of OFAC, and banks

 3    understand that.  And, therefore, they get themselves -- get

 4    consents related to OFAC from their customers.  But they

 5    don't -- but they do not negate the entire regime of these 30

 6    other countries.

 7              THE COURT:  Okay.

 8              MR. MOLONEY:  That's the only step back.

 9              THE COURT:  Anything else?

10              MR. MOLONEY:  The only other thing I would say, your

11    Honor, just skipping ahead to slide 18 of the last slide, this

12    is the last point I would make, your Honor, which kind of goes

13    to why not use the Hague Convention, which your Honor

14    suggested.

15              I think we have here that the interests of the United

16    States in this -- in facilitating any discovery here is very

17    slight.  The interest of the BVI is questionable, in light of

18    the fact that your Honor observed the laws -- the law they're

19    trying to move forward on has been rejected by the BVI courts.

20    The trustee for the Madoff estate is following that route, and

21    I think the fact that the trustee for the Madoff estate is

22    following that route in each cases involving Fairfield is good

23    evidence that this is a reasonable route to require them to

24    follow.  And I think that's the only -- unless your Honor has a

25    question, that's all I would like to say.
```

C76efaic

1              THE COURT:  I think I'm finished.

2              Mr. Molton, did you have something --

3              MR. MOLTON:  I need to respond to that.  Mr. Moloney

4      knows that Mr. Picard has attempted to seek expedited discovery

5      probably a month before us in front of Judge Lifland.

6              THE COURT:  Month before we did.

7              MR. MOLTON:  You're right, a month before we did, in

8      front of Judge Lifland, and reached various agreements with

9      various people.

10             Also, Mr. Picard does not have the benefit -- and I

11     know we heard this last year, and I'm going to get back to it

12     again -- does not have the benefit of the document we have

13     whereby the defendants themselves, these very sophisticated

14     international financial institutions, consented to the

15     jurisdiction of the New York courts to resolve disputes

16     regarding the agreement and the fund.  And if Mr. Picard had

17     that agreement, he might be doing something else.  So

18     Mr. Moloney's reference to what Mr. Picard is doing is really

19     irrelevant, because he has a different situation than we do.

20             THE COURT:  All right.  Anything else?

21             MR. MOLONEY:  Yes.  Just very briefly on this last

22     point about the agreement, we have a slide for that which is

23     slide 8, your Honor.  And this is part of why we sought the

24     stay, frankly, in the bankruptcy court, your Honor, is that

25     there's a bit of a shell game going on here, which is that

C76efaic

1    they're relying here in the United States on this provision,

2    which we quote, that says that they can pursue -- if the

3    action's with respect to this agreement and the fund, it can be

4    brought in New York State court.  And BVI, they're saying the

5    actions they bring are not with respect to the subscription

6    agreement but they're under the articles of association, which

7    is why they're applying BVI law in the BVI; don't apply

8    New York law here.

9         Now, we don't believe this provision applies.  We

10   don't believe this provision -- but I assume that's an issue

11   that Judge Lifland will deal with on remand.

12        THE COURT:  All right.  Anything else, friends?  Okay,

13   be back in five.

14        MR. MOLTON:  Judge, can I just do some clean-up points

15   that may have nothing to do with the argument, but just

16   clean-up points?

17        THE COURT:  Sure.

18        MR. MOLTON:  Number of things.

19        First of all, Judge, there's a number of joinders who

20   filed papers who were not objectors below.  And we don't think

21   that they have any standing to have their -- now first instance

22   objection considered by your Honor or be part of the order, any

23   order your Honor may deliver.  And I have a list of those.  We

24   can include those.  So I think -- just trying to clean that up,

25   Judge.

C76efaic

1           MR. MOLONEY:  Your Honor, perhaps that can be read out

2      loud, because these parties --

3           THE COURT:  We'll just mark it.

4           MR. MOLTON:  I can read it out loud, Judge.  Okay.

5      No.  Would you like me to read the five out loud, Judge?

6           THE COURT:  Sure.  If that makes you happy.

7           MR. MOLTON:  Well, Bank Vontobel AG; Falcon Private

8      Bank; Incore, with an I, Bank AG; Lombardy Properties Limited;

9      Zenit Alternative Investment.

10          The second point, your Honor -- something that wasn't

11     really briefed but is part of the order and we don't think

12     should be -- was at all a subject of the discussion or the

13     attack is a second part of the order.  We had asked in our

14     motion to have an ability to amend complaints to include

15     information that we developed independently of this disclosure

16     order as to beneficial owners so that we get those in by the

17     22nd of July.

18          And also, we had delivered to the Court, pursuant to

19     an agreement that we worked out, a schedule of amendments that

20     include all sorts of other issues that would be included in the

21     amended complaints.  And Judge Lifland granted that part of our

22     motion.  And we would ask that that issue, which really hasn't

23     been the subject of the appeal --

24          THE COURT:  That's not even before me.

25          MR. MOLTON:  But your Honor stayed the order in its

C76efaic

1   entirety.

2           THE COURT:  All right.

3           MR. MOLTON:  So we're prohibited from going forward on

4   that.

5           THE COURT:  I got it.

6           MR. MOLTON:  So that's why I'm cleaning that up.

7           MR. MOLONEY:  Your Honor, can I be heard on that one

8   issue?

9           THE COURT:  Sure.  Let counsel get his laundry list

10  out.

11          MR. MOLTON:  Okay.  And lastly, your Honor, your Honor

12  talked about sequencing --

13          THE COURT:  Yes, sir.

14          MR. MOLTON:  -- in front of Judge Lifland.  And that's

15  something -- I mean, one of the things is we have a lot of

16  people here but we do work very well together.  So that's an

17  issue that, if your Honor believes that that's something that

18  the parties can discuss with Judge Lifland, that's something,

19  if that's going to be part of an order that your Honor

20  delivers, you know, we submit that that's something that the

21  parties, with Judge Lifland's oversight and supervision, can

22  work out in a way that corresponds to whatever your Honor

23  delivers in your order.  So that's my third point.

24          THE COURT:  Thank you.

25          MR. MOLONEY:  Very briefly, only as to the amendment

C76efaic

1    issue, your Honor, our position is that the only amendments

2    that should be allowed with respect to those cases that are

3    subject to the motion to remand are ones that relate to

4    timeliness.  I think they're just going to -- we've already

5    filed two abstention motions against those documents.  We

6    really don't want to have to file a third motion.  If it does

7    relate to timeliness, we don't think they should be allowed to

8    amend those complaints that are subject to our motion to remand

9    back to state court.

10            THE COURT:  All right.  Anyone else?  Anyone else?

11   Counsel?

12            MR. LEVY:  Your Honor, Sam Levy, counsel for Bank

13   Vontobel.  We're one of five that were just listed as not being

14   objected.

15            Number one, that's not true.  Bank Vontobel and

16   Vontobel Asset Management, its subsidiary, did object.

17            Number two, Bank Vontobel AG hasn't even been served

18   in this case, wasn't served with the motion papers, wasn't even

19   properly served with a summons and complaint.  So to the extent

20   the Court is going to consider carving out those five entities

21   who have made appearances and have joined in these objections,

22   we want to be heard in that respect.

23            THE COURT:  Thank you.

24            Who else, anybody?

25            Okay.  Thank you, counsel.  We'll be back in five

C76efaic

1    minutes.

2                (Recess)

3                THE COURT:  When reviewing a decision of the

4    bankruptcy court, this Court sits as an appellate court.  It

5    reviews the bankruptcy court's conclusions of law de novo but

6    its findings of fact for clear error.  *In re Quigley Co.*,

7    449 B.R. 196, 200-01 (S.D.N.Y. 2010) (citing *In Re Bayshore*

8    *Wire Products Corp*, 209 F.3d 100, 103 (2d Cir. 2000.))

9    Questions about the bankruptcy court's subject matter

10   jurisdiction and questions of statutory and contract

11   interpretation are legal questions that are reviewed de novo.

12   *In re Marconi PLC*, 363 B.R. 361, 363 & n.2 (S.D.N.Y. 2007).

13               Federal Rule of Civil Procedure 26(d)(1) does provide

14   that a party may seek discovery before a Rule 26(f) conference

15   "when authorized ... by court order."  Generally, courts apply

16   a reasonableness standard in determining whether to grant early

17   expedited discovery.  See *Ayyash v. Bank Al-Madina*, 233 F.R.D.

18   325, 326-27 (S.D.N.Y. 2005).  This Court will assume without

19   deciding for the purposes of this appeal that such discovery

20   was at minimum "reasonable" in this case.  This Court certainly

21   has doubts about its reasonableness in light of the bankruptcy

22   court's statement that such discovery was sought "because

23   certain defendants have indicated that they intend to raise

24   defenses on the grounds that they have acted solely as agents,

25   trustees or custodians for beneficial holders, or that they

C76efaic

changed their positions by transmitting redemption payments to

beneficial holders." See June 27, 2012 opinion at 2.  Taking

that statement as true, such discovery is, of course, merits

related.

          The Court is also troubled by the bankruptcy court's

statement that such discovery is reasonable in this case

because the foreign representative "has no other means of

obtaining this information and absent production by the

defendants, the litigation against the beneficial owners cannot

proceed." See June 27, 2012, opinion at 3-4.

          The foreign representative has always had the

available procedures under the Hague Evidence Convention at his

disposal, and his failure to utilize them certainly weighs on

the reasonableness analysis.  The Court will nonetheless leave

that particular question of reasonableness for another day.

          Where the Hague Evidence Convention does come into

play, however, is in reviewing the bankruptcy court's grant of

the foreign disclosure order that defendants assert will cause

them to violate some 30 international banking privacy schemes.

While the foreign representative claims that defendants have

failed to establish a prima facie true conflict of laws, (see

foreign representative's opposition brief at 17-26), it is

clear from the bankruptcy court's opinion that the issue of a

general waiver of such laws was dispositive.  The bankruptcy

court stated that defendants had "explicitly consented" to such

89

C76efaic

discovery, and that defendants' arguments were a "thinly veiled attempt to undo defendants' self-created dilemma arising from their consenting to provide the information the foreign representative seeks." June 27, 2012, opinion at 2, 5.  Indeed, there is no discussion anywhere in the opinion of the bankruptcy court on the merits of the international law conflict outside the context of a waiver.  In finding that such a general waiver existed, the bankruptcy court relied on two provisions common to all of the form subscription agreements in this case.  The Court addresses each one in turn.

The bankruptcy court cites to a paragraph of the subscription agreements entitled "Office of Foreign Assets Control," which it and the foreign representative label the "disclosure consent provision."  The subscription agreement to which the bankruptcy court cites is found in Exhibit A to the declaration of Shoshana Kaiser in support of the foreign representative's reply memorandum of law.  (Bankr. ECF No. 747) at Tab 45.  The Court assumes for the purpose of this appeal that the bankruptcy court intended to refer to paragraph 20(B) of that document, in which the cited language is found, rather than paragraph 21(B), which does not appear to exist.

Paragraph 20(A) states:  Office of Foreign Assets Control.  A, subscriber understands and agrees that the fund prohibits the investment of funds by any persons or entities that are acting, directly or indirectly, (i) in contravention

C76efaic

of any applicable laws and regulations, including anti-money

laundering regulations or conventions; (ii), on behalf of

terrorists or terrorist organizations, including those persons

or entities that are included on the list of specially

designated nationals and blocked persons maintained by the US

Treasury Department's Office of Foreign Assets Control

("OFAC"), as such list may be amended from time to time; (iii)

for a senior foreign political figure, any member of a senior

foreign political figure's immediate family or any close

associate of a senior foreign political figure, unless the

fund, after being specifically notified by subscriber in

writing that it is such a person, conducts further due

diligence and determines that such investment shall be

permitted; or (iv) for a foreign shell bank (such persons or

entities in (i)-(iv) are collectively referred to as

"prohibited persons.")

      Paragraph 20(B) goes on to require that each

subscriber warrant that neither it nor any entity controlling,

controlled by or under common control with it is a "prohibited

person" as defined in the preceding paragraph 20(A).  Paragraph

20(B) then requires that to the extent any subscriber has

beneficial owners, it makes identical representations based on

its own due diligence about those beneficial owners, i.e., that

any such persons or entities are not "prohibited persons"

within the meaning ascribed to that term in the preceding

C76efaic

1    paragraph, 20(A).

2              Finally, paragraph 20(B), in language cited by the

3    bankruptcy court, requires that each subscriber "holds the

4    evidence of such identities <u>and status</u> and will maintain all

5    such evidence for at least five years from the date of

6    subscriber's complete redemption from the fund and ... it will

7    make available such information and any additional information

8    required by the fund, <u>that is required under applicable</u>

9    <u>regulations</u>."

10             Tellingly, neither the foreign representative nor the

11   bankruptcy court notes that this cited language is contained

12   within a paragraph entitled "Office of Foreign Assets Control."

13   Neither does the foreign representative nor the bankruptcy

14   court concede that the disclosure requirement contemplated

15   within paragraph 20(B) very clearly relates to beneficial

16   owners' status as "prohibited persons" within the meaning of

17   the preceding paragraph.  Indeed, paragraph 20(C) goes on to

18   describe the fund's options with respect to the disclosure of

19   beneficial owner identities "if any of the foregoing

20   representations, warranties or covenants ceases to be true or

21   if the fund no longer reasonably believes that it has

22   satisfactory evidence as to their truth."

23             It is clear that these three paragraphs, when read

24   together, establish no more than a limited duty to disclose the

25   identities of beneficial owners where any such owner is

C76efaic

reasonably believed to be a "prohibited person" within the

meaning of paragraph 20(A).  The suggestion of the foreign

representative, as adopted by the bankruptcy court below, that

the language in paragraph 20(B) contains a broad and unlimited

waiver of international privacy laws for all purposes wrapped

within a narrowly circumscribed duty to disclose is

unsupportable.  The Court need not resort to such canons of

contract construction as the foreign representative advances on

page 21 of his opposition brief where the text itself is not

ambiguous.  Moreover, even if this Court were to find that the

subscription agreements were at all ambiguous, the Court would

be constrained to construe any ambiguity against the fund as

the drafter of this language.  See, e.g. Fogarty v. *Near North*

*Insurance Brokerage, Inc*., 162 F.3d 74, 78, (2d Cir 1998)

(discussing contra proferentem document in contract

construction).

        The bankruptcy court then cites to a paragraph of the

subscription agreements entitled "If Subscriber is acting as a

Representative" which it labels the "Beneficial Shareholders'

Consent Provision," and the foreign representative refers to as

the "Requisite Authority Representation." June 27, 2012,

opinion at 6; foreign representative's opposition brief at 17.

        Again, the subscription agreement to which the

bankruptcy court cites is found in Exhibit A to a declaration

of Shoshana Kaiser in support of the foreign representative's

C76efaic

reply memorandum of law.  (Bankr. ECF No. 747) at Tab 45.  This

Court assumes for the purpose of this appeal that the

bankruptcy court here intended to refer to paragraph 27 of that

document in which the cited language is found, rather than 28,

which is entitled "Country Specific Disclosures."

Paragraph 27 states in pertinent part:  If subscriber

is subscribing as trustee, agent, representative or nominee for

another person (the "beneficial shareholder"), subscriber

agrees that the representations and agreements herein are made

by subscriber with respect to itself and the beneficial

shareholder.  Subscriber has all requisite authority from the

beneficial shareholder to execute and perform the obligations

hereunder.

The Court finds this boilerplate provision to set

forth the uncontroversial proposition that, to the extent any

subscriber signs this agreement as the agent of another entity,

it does so with the full authority to bind the principal to the

representations and agreements made therein.  There is nothing

in this language that constitutes a general waiver of foreign

privacy laws, and because the Court has already determined that

paragraph 20(B) contains no general waiver, paragraph 27 does

not codify one by implication.  If anything, paragraph 27

merely affirms that the beneficial shareholder is bound by the

limited duty to disclose described above.

The foreign representative has not and cannot invoke

C76efaic

that limited duty here.  The foreign representative argues in
his papers that "if, in fact, the fund has no right to disclose
the identity of beneficial shareholders, this would lead to the
absurd result that notwithstanding the requisite authority
provision, the panoply of contractual rights that are conferred
on the fund by virtue of that provision would be entirely
illusory." (Foreign representative's opposition brief at
18-19).  The Court must reject this proposition, as the foreign
representative does possess the entirety of the limited right
to disclose for which the fund has contracted.  Any disclosure
that can be achieved by pursuing the Hague Evidence Convention
protocols (and thereby avoiding the conflict of laws at issue
here), and whatever disclosure may be achieved on the consent
of the parties.  I also note, as set out in oral argument here
today, that the funds also have contractual rights against the
subscribers.

　　　　For these reasons, the Court holds that the bankruptcy
court's finding of a broad general waiver of the international
banking privacy laws invoked in this case, based on those
sections of the subscription agreements cited below, to be
erroneous on de novo review.

　　　　Now, the foreign representative points to another
possible source of the broad waiver it asserts in this case.
He notes what he refers to as "unequivocal standalone" language
in the Fairfield Sentry private placement memorandum, as

C76efaic

1    incorporated into the subscription agreements, conferring an

2    unqualified right to the identity of a beneficial owners.

3    (Foreign representative's opposition brief at 20.)   The private

4    placement memorandum can be found in Exhibit 2 to the

5    declaration of Kerry L. Quinn in support of foreign

6    representative's opposition brief, and the relevant language in

7    Exhibit A to the Krys, K-R-Y-S?

8              MR. MOLTON:   Krys.

9              THE COURT:   Thank you. -- declaration at page 25

10   contained therein.   The Court first observes that neither the

11   private placement memorandum nor the language contained therein

12   was cited by the bankruptcy court as a basis for decision.   The

13   Court will address it briefly, however, in the interest of

14   thoroughness.

15             As cited in the foreign representative's brief, this

16   language states:   "The investment manager reserves the right to

17   request such information as is necessary to verify the identity

18   of the subscriber and the underlying beneficial owner of a

19   subscriber's or a shareholder's shares in the fund." (Foreign

20   representative's opposition brief at 20).   A cursory review of

21   the private placement memorandum itself, however, quickly

22   reveals that this language is anything but unequivocal or

23   standalone.   Indeed, it is tucked within the section of the

24   memorandum entitled "anti-money laundering regulations" and is

25   immediately preceded by the following language:

C76efaic

1                    <u>As part of the funds or administrator's responsibility</u>

2      <u>for the prevention of money laundering,</u> the investment manager

3      and its affiliates, subsidiaries or associates may require a

4      detailed verification of a shareholder's identity, any

5      beneficial owner underlying the account and the source of the

6      payment.  This is found in the same spot in the papers as I

7      just noted, but with emphasis added.

8                    This same important qualification can be found in the

9      subscription agreement itself at paragraph 21.  The Court does

10     not understand the foreign representative to be invoking the

11     fund's responsibility for the prevention of money laundering in

12     requiring this disclosure.  And indeed, he's confirmed that

13     today.  So it's therefore unsurprising that the bankruptcy

14     court did not rely on this qualified language as a basis for

15     decision below.  Any argument that this language standing alone

16     constitutes a broad general waiver of all international banking

17     privacy laws is without merit.  And thus, the bankruptcy

18     court's finding to that effect is clear error.

19                    Although not a basis for decision in the bankruptcy

20     court, the foreign representative's counsel points today at

21     oral argument to two additional provisions in the subscription

22     agreement:  Paragraphs 22 and 29.

23                    Paragraph 22 states the fund may disclose the

24     information about subscriber that is contained herein as the

25     fund deems necessary to comply with applicable law or as

C76efaic

required in any suit, action or proceeding.  That provision,

however, does not give the funds the power to force disclosure

of information by the beneficial holders.  It only gives the

fund the right to disclose "the information about subscriber

that is contained herein."  That is, in the subscription

agreement.  Even if the subscriber in that sentence can be

interpreted as including beneficial holders, it still does not

give the funds the right to compel and then disclose the

information required in the foreign disclosure order.

        Similarly, with respect to paragraph 29, which

provides only a limited right for information, that paragraph

states "the fund may request from the subscriber such

additional information as it may deem necessary to evaluate the

eligibility of the subscriber to acquire shares and may request

from time to time such information as it may deem necessary to

determine the eligibility of the subscriber to hold shares or

to enable the fund to determine its compliance with applicable

regulatory requirements or its tax status, and the subscriber

agrees to provide such information as may reasonably be

requested.

        Thus, paragraph 29, again, only gives the fund the

right to require certain limited information; that is,

information "necessary to determine the eligibility of the

subscriber to hold shares or to enable the fund to determine

its compliance with applicable regulatory requirements or its

C76efaic

 1    tax status."  None of those issues is in question here, and

 2    such information is not the information that is required to be

 3    disclosed by the foreign disclosure order.  Accordingly, I

 4    reject the foreign representative's reliance on paragraphs 22

 5    and paragraph 29 of the subscription agreements.

 6          The Court concludes that the bankruptcy court's error

 7    as to waiver is indeed reversible error.  The foreign

 8    representative argues that even if this Court should conclude

 9    that a comity analysis is required, such an analysis would lead

10    to the conclusion that the bankruptcy court's order should be

11    upheld and, therefore, a reversal is not required (foreign

12    representative's opposition brief at 26).

13          This Court cannot agree.  As noted earlier, it's clear

14    that the waiver issue was the sole basis for the bankruptcy

15    court's merits rule.  Its opinion gives this Court no other

16    findings as to the existence of a true conflict of law or the

17    result of a comity analysis, should it undertake one.  Because

18    this Court does not have the benefit of the bankruptcy court's

19    reasoned analysis, this case is unlike *In Re Vivendi Universal*

20    *SA Securities Litigation*, 618 F.Supp. 2d 335 (S.D.N.Y. 2009),

21    to which the foreign representative cites, in which the

22    district court held that a magistrate judge's misapplication of

23    French law did not result in reversible error where the comity

24    analysis on the whole remained correct.  See *Id.* at 341.

25          The foreign representative's arguments regarding the

C76efaic

existence of a true conflict, the applicability of foreign

"blocking" statutes in a comity analysis, the need for

individualized analysis of the foreign banking privacy regimes,

and the like, are properly questions for the bankruptcy court

on remand.  When reviewing a decision of the bankruptcy court,

this court sits as an appellate court.  Accordingly, it is

preferable for the bankruptcy court to address the issues

raised in the foreign representative's opposition brief as to

the comity analysis in the first instance.

        The Court now addresses the defendants' second grounds

for appeal:  That the bankruptcy court erred in declining to

resolve the issues of subject matter jurisdiction, personal

jurisdiction and abstention on remand from this court, prior to

issuing the foreign discovery order pursuant to Federal Rule of

Civil Procedure 26(d)(1).

        At the outset a clarification is necessary.  While it

is true that this case was remanded to the bankruptcy court for

a determination on, inter alia, mandatory abstention, that

remand was not a statement by this Court that "related to"

jurisdiction could or should be presumed in this case (see

foreign representative's opposition brief at 29).  Nor does the

Court of Appeals ruling in *S.G. Philips Constructors, Inc. v.

City of Burlington*, 45 F.3d 702 (2d Cir. 1995) compel that

presumption.  In fact, this Court specifically stated in its

opinion at page 39 that "here, the Chapter 15 proceedings are

C76efaic

ancillary to the BVI proceedings," and "the right of recovery

is not provided by federal bankruptcy law."  Defendants have

since received a favorable final judgment in those same BVI

proceedings, and that judgment has been affirmed on appeal.

Defendants have also consistently argued that the

jurisdictional ground in 28 U.S.C. Section 1334(b) does not

include Chapter 15 cases within the scope of "related to"

jurisdiction.  Ultimately, resolution of both the underlying

question of subject matter jurisdiction and subsequent question

of mandatory abstention lie in the bankruptcy court.  This

Court's prior remand does not presuppose the bankruptcy court's

conclusion on the merits of defendants' subject matter

jurisdiction challenge, but merely directs that should the

bankruptcy court find "related to" jurisdiction exists, it must

also undertake mandatory abstention analysis.

        As to jurisdiction generally, the Supreme Court of the

United States has stated that "the requirement that

jurisdiction be established as a threshold matter 'springs from

the nature and limits of the judicial power of the United

States' and is 'inflexible and without exception.'"  See *Steel

Company v. Citizens for a Better Environment,* 523 U.S. 83, 94

(1998) (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S.

379, 382 (1884)).  While defendants are certainly correct that

"jurisdictional questions ordinarily must precede merits

determinations in dispositional order," see *Sinochem

C76efaic

1   *International Co. Limited v. Malaysia International Shipping*

2   *Corp.*, 549 U.S. 422, 431 (2007), the Supreme Court has also

3   said that there is no "mandatory sequencing of jurisdictional

4   issues."  See *Ruhrgas AG v. Marathon Oil Company*, 526 U.S. 574,

5   584 (1999).  It would also appear that the *Enron* and *Morgan*

6   *Stanley* cases cited by the bankruptcy court below at page 4 do

7   establish a precedent in the bankruptcy court from the Southern

8   District of New York of permitting such expedited discovery

9   where pending statutes of limitation and possible agency

10  defenses are at issue.  The Court observes, however, that

11  neither the Enron nor the Morgan Stanley case involved an

12  ongoing challenge to the subject matter jurisdiction of the

13  bankruptcy court as here.

14          The Court is aware of those cases which have

15  affirmatively permitted discovery in advance of resolving

16  jurisdictional issues.  In *Sinochem*, for example, the Supreme

17  Court described forum non conveniens as "a nonmerits ground for

18  dismissal," and held that "a district court, therefore, may

19  dispose of an action by a forum non conveniens dismissal by

20  passing questions of subject matter and personal jurisdiction

21  when considerations of convenience, fairness and judicial

22  economy so warrant."  See *Sinochem*, 549 U.S. at 432.

23  Similarly, the Court of Appeals has held that jurisdictional

24  discovery itself may be appropriate where the defendant

25  challenges jurisdiction in order to help the Court resolve that

C76efaic

1   issue.  See *Lehigh Valley Industries Inc. v. Birenbaum*, 527

2   F.3d 87, 93 (2d Cir. 1975).

3            Whatever this Court's intuition about the wisdom of

4   ordering expedited Rule 26 discovery prior to resolving

5   threshold jurisdictional issues, this Court declines the

6   invitation to view the cases just cited as an exhaustive list

7   of occasions on which a federal court may bypass jurisdictional

8   questions.  To the extent a bright line exists on this

9   question, it appears to be that set out in *Sinochem*:

10  "Jurisdictional questions ordinarily must precede merits

11  determinations in dispositional order."  Even if the foreign

12  disclosure order is arguably "merits related", it is not itself

13  a decision on the merits such as would violate the Supreme

14  Court's mandate in *Sinochem*.

15           Therefore, defendants have not demonstrated that the

16  bankruptcy court committed reversible error merely by issuing

17  the foreign disclosure order pursuant to Federal Rule of Civil

18  Procedure 26 prior to resolving challenges to subject matter

19  jurisdiction, personal jurisdiction and abstention.  Moreover,

20  because the memorandum opinion and order of the bankruptcy

21  court has already been reversed in large part and remanded for

22  the reasons stated, it permits the Court to avoid reaching a

23  question of a constitutional nature, which is advisable

24  whenever it is possible.  See, e.g. *Allstate Insurance Co. v.*

25  *Serio*, 261 F.3d 143, 149-50 (2d Cir. 2001) ("It is axiomatic

C76efaic

1    that the federal courts should, where possible, avoid reaching

2    constitutional questions.") (citing *Spector Motor Service, Inc.*

3    *v. McLaughlin,* 323 U.S. 101, 105 (1994)).

4            Accordingly, for the reasons set out above, the

5    June 27, 2012, order of the bankruptcy court is reversed, to

6    the extent set out in the matter remanded to the bankruptcy

7    court.  This Court's stay of proceedings is lifted as to those

8    portions of the June 27, 2012, order not affected by today's

9    ruling.

10           The motion to clarify that the foreign disclosure

11   order only applies to certain parties who signed subscription

12   agreements is denied as moot, in light of the reversal of the

13   foreign disclosure order.

14           The motion for mandamus is denied.

15           The motion to dismiss for lack of subject matter

16   jurisdiction is denied without prejudice to the bankruptcy

17   court's ruling on the motion in the first instance.

18           The motion with respect to the joinder issue raised by

19   Mr. Molton at the end of our argument is not reached, in light

20   of the reversal of the foreign disclosure order.  And the Court

21   agrees with the foreign representative that a proper ordering

22   of the jurisdictional and other issues on remand is something

23   that the bankruptcy court and the parties can confer about with

24   an eye toward the "just, speedy and inexpensive" resolution of

25   matters contemplated in Federal Rule of Civil Procedure 1.

C76efaic

1              Counsel, have I forgotten anything?

2              MR. MOLTON:  Judge, just to be clear, with respect to

3     those folks who didn't object to the disclosure order or didn't

4     take appeal or join in connection therewith, does the --

5              THE COURT:  The order is reversed as to one, it's

6     reversed as to all.

7              MR. MOLTON:  I just wanted to make sure we didn't get

8     into a trouble where we'd have to come back for clarification.

9              THE COURT:  Anything else, counsel?

10             Thank you, ladies and gentlemen.  Thank you for

11    putting your papers in in such quick order, friends.

12             (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25